**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **RUTH SHERRILL** | * | |
| 2631 Waterview Avenue | * | |
| Baltimore, Maryland  21230 | * | |
| (Baltimore City) | * | |
| | | |
| **ELIZABETH ARNOLD** | * | |
| 2210 Annapolis Road | * | |
| Baltimore,  Maryland  21230 | * | |
| (Baltimore City) | * | |
| | | |
| **MERAB RICE** | * | |
| 2309 Annapolis Road | * | |
| Baltimore, Maryland  21230 | * | |
| (Baltimore City) | * | |
| | | |
| **SHERRY MOORE-EDMONDS** | * | |
| 2631 Waterview Avenue | * | |
| Baltimore, Maryland  21230 | * | |
| (Baltimore City) | * | |
| | * | |
| **TIM BULL** | * | |
| 2039 Annapolis Road | * | |
| Baltimore, Maryland 21230 | * | |
| (Baltimore City) | | |
| | | |
| **JULIA DINKINS** | * | **Civil Action No.** |
| 2609 Carver Road | * | **1:13-CV-2768** |
| Baltimore, Maryland 21225 | * | |
| (Baltimore City) | * | |
| | * | |
| **BRUCE GOLDFARB** | * | |
| 600 Maiden Choice Lane | * | |
| Baltimore County | * | |
| Catonsville, Maryland 21228 | * | |
| (Baltimore County) | * | |
| | * | |
| **and** | * | |
| | * | |
| **MICHAEL GALLAGHER** | * | |
| 2304 Sidney Avenue | | |

Baltimore, Maryland 21230
(Baltimore City)                                          *

      **Plaintiffs,**  *
            *
**v.**           *
            *

**MAYOR AND CITY COUNCIL OF** *
**BALTIMORE**      *
100 N. Holliday Street, Room 250  *
Baltimore, Maryland 21202   *
(Baltimore City)     *
            *

  c/o George A. Nilson, City Solicitor *
  100 N. Holliday Street, Suite 101 *
  Baltimore, Maryland  21202  *
           *

**CITY OF BALTIMORE**   *
**DEVELOPMENT CORPORATION** *
36 S. Charles Street, Suite 1600  *
Baltimore, Maryland 21201   *
(Baltimore City)     *
            *

  c/o Clayton J. Powell Jr.  *
  One E. Lexington Street   *
  Baltimore, Maryland 21202  *
           *

**CBAC GAMING, LLC**   *
One Caesar's Palace Drive   *
Las Vegas, Nevada 89109   *
            *

  c/o CSC-Lawyers Incorp. Service Co. *
  7 St. Paul Street, Suite 1660  *
  Baltimore, Maryland  21202  *
           *

**CBAC BORROWER, LLC**  *
One Caesar's Palace Drive   *
Las Vegas, Nevada 89109   *
            *

  c/o CSC-Lawyers Incorp. Service Co. *
  7 St. Paul Street, Suite 1660  *
  Baltimore, Maryland  21202  *
           *

2

| | |
|---|---|
| **MARYLAND CHEMICAL COMPANY, INC.** | * |
| | * |
| 3310 Childs Street | * |
| Baltimore, Maryland 21226 | * |
| (Baltimore City) | * |
| | * |
| c/o Bernard S. Denick | * |
| 8 Park Center CT, Suite 200 | * |
| Baltimore County | * |
| Owings Mills, MD 21117 | * |
| | * |
| **Defendants.** | * |
| | * |

## COMPLAINT

Plaintiffs, by and through their undersigned counsel, Rich and Henderson, P.C., file this Complaint and allege as follows:

## INTRODUCTION

1.     Plaintiffs bring this action against Defendants Mayor and City Council of Baltimore, City of Baltimore Development Corporation, CBAC Gaming, LLC, CBAC Borrower, LLC, and Maryland Chemical Company, Inc. pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq*., to control the sources of environmental contamination at the site of the proposed Horseshoe Baltimore Casino on the North Shore of the Middle Branch in Baltimore, Maryland (the "Casino Site") which are migrating off-site and into the adjacent public recreational areas (the "Waterfront Parcels") and ecological resources of the Middle Branch of the Patapsco River.

2.     As alleged herein, past spills and releases of hazardous substances and/or hazardous wastes at the Casino Site (including, but not limited to, chlorinated volatile organic compounds ("VOCs"), polycyclic aromatic hydrocarbons ("PAHs") and heavy metals) have been left unaddressed and/or unremediated and, as a result, are a continuing source of contamination in the soils and

3

groundwater at the Casino Site. The hazardous substances and/or hazardous wastes at and under the Casino Site have migrated and are continuing to migrate off-site at levels well above the applicable federal and state cleanup standards, risk-based standards and/or regulatory limits.

3.      The acts and/or omissions of Defendants, which are described in further detail below, have caused and/or contributed to the imminent and substantial endangerment to human health and the environment which is presented by the ongoing migration and presence of VOCs, PAHs and heavy metals in and around the Casino Site and the Waterfront Parcels.

4.      Notwithstanding the recent "remediation" and redevelopment efforts at the Casino Site, no action has been or is proposed to be taken to address, mitigate, control or otherwise remediate the ongoing migration and presence of VOCs, PAHs and heavy metals in and around the Casino Site and the Waterfront Parcels.

5.      As authorized by 42 U.S.C. § 6972(a), Plaintiffs seek an order from this Court which compels Defendants to take any and all remedial measures necessary to address and control the contamination at and under the Casino Site which is migrating and will continue migrating off-site unless and until it is enjoined.   Plaintiffs also seek an order from this Court which enjoins Defendants from undertaking any further unlawful hazardous waste handling, treatment, storage, transportation and disposal activities at the Casino Site.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 6972.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. §§ 6972(a)(2) and 6972(c) because the imminent and substantial endangerment that is subject of this action

is located in this district and because Defendants' alleged hazardous waste violations which are the subject of this action are occurring in this district.

8.      On May 6, 2013, Plaintiffs Ruth Sherrill, Sherry Moore-Edmonds, Elizabeth Arnold, Merab Rice, Tim Bull and Julia Dinkins provided Defendants with written notice of their intent to file suit against Defendants Baltimore City, CBAC Gaming, LLC and Maryland Chemical Company, Inc. (the "May Notice Letter") as required by 42 U.S.C. §§ 6972(b)(1)(A) and 6972(b)(2)(A).

9.      On September 18, 2013, Plaintiffs supplemented and amended the May Notice Letter in its entirety and provided Defendants with written notice of their intent to file suit as required by 42 U.S.C. §§ 6972(b)(1)(A) and 6972(b)(2)(A) (the "September Notice Letter").

10.     As noted in Plaintiffs' September Notice Letter, this action is proper under the waiting period exception provided by 42 U.S.C. §§ 6972(b)(1)(A)(iii) and 6972(b)(2)(A)(iii)  because the relief requested herein seeks to enjoin and correct Defendants' past and present unlawful hazardous waste handling, storage, treatment, transportation and disposal activities at the Casino Site.

11.     In accordance with 42 U.S.C. §§ 6972(b)(1)(B), 6972(b)(2)(B) and 6972(b)(2)(C), Plaintiffs may commence this action because neither the U.S. Environmental Protection Agency ("EPA") nor the Maryland Department of the Environment ("MDE") has commenced and/or is diligently prosecuting a civil or criminal action against Defendants to enjoin the hazardous waste violations which are the subject of this action and/or to restrain or abate the acts or conditions which have contributed and/or are contributing to the imminent and substantial endangerment which is present at the Casino Site and the Waterfront Parcels.  Specifically, EPA and MDE have not: filed an action under § 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9606, or 42 U.S.C. § 9673; engaged in a removal action under § 104 of

CERCLA, 42 U.S.C. § 9604; incurred costs to initiate a remedial investigation and feasibility study under § 104 of CERCLA, 42 U.S.C. § 9604 and proceeded with a removal action thereunder; obtained a court order under § 106 of CERCLA, 42 U.S.C. § 9606, or 42 U.S.C. § 9673; and/or issued an administrative order under § 106 of CERCLA, 42 U.S.C. § 9606, or 42 U.S.C. § 9673.

12.    Plaintiff Bruce Goldfarb is, and at all times relevant to this Complaint was, a resident of Catonsville, Maryland.  Mr. Goldfarb is an avid photographer and journalist that enjoys biking and taking photographs along the Gwynns Falls Trail.  Mr. Goldfarb enjoys biking through the entire length of the Gwynns Falls Trail System, including the portion of the trail located along the Waterfront Parcels, because of the variety of historic and aesthetic views that it offers.  Mr. Goldfarb particularly enjoys biking through and photographing the fauna, flora, forestry and other greenery along the Trail.  Mr. Goldfarb has taken his family on the Gwynns Falls Trail by bicycle and would like to take his younger children through the entire length of the Gwynns Falls Trail in the future.

13.    Mr. Goldfarb is concerned about the health risks associated with the contamination at the Casino Site and its migration to the Waterfront Parcels and the Middle Branch, both for himself and for more sensitive populations such as his children.  Due to the existing contamination at the Casino Site and the Waterfront Parcels, Mr. Goldfarb will not visit the portion of the Gwynns Falls Trail on and around the Waterfront Parcels with his children.  Due to the existing contamination at the Casino Site and the Waterfront Parcels, Mr. Goldfarb has not and will not stop for photographs while biking along the portion of the Gwynns Falls Trail on and around the Waterfront Parcels by himself.

14.    Mr. Goldfarb is also concerned about the adverse impacts to the habitat and wildlife in and around the shoreline of the Middle Branch and the water quality of the Middle Branch itself.  The Middle Branch's contaminated waters and degraded ecosystem diminish his enjoyment of the Gwynns

Falls Trail, including the portion of the Gwynns Falls Trail on and around the Waterfront Parcels.  If Mr. Goldfarb knew that the contamination at the Casino Site and the Waterfront Parcels was fully addressed and remediated, he would be comforted in knowing that the area on or around the Waterfront Parcels was safer for human use and he would visit the portion of the Gwynns Falls Trail on and around the Waterfront Parcels more often.

15.     Plaintiff Michael Gallagher is, and at all times relevant to this Complaint was, a resident of the Westport Neighborhood in Baltimore City.  Mr. Gallagher regularly uses the City's Light Rail System to travel to downtown Baltimore.  When the Light Rail is not in operation and/or when the weather permits, Mr. Gallagher uses the Gwynns Falls Trail, which includes the portion along the Waterfront Parcels, to get into downtown Baltimore.  Mr. Gallagher enjoys walking along the Gwynns Falls Trail for exercise and for its waterfront views.  As a frequent user of the Gwynns Falls Trail, including the portion of the Trail along the Waterfront Parcels, Mr. Gallagher is concerned about the health risks that are associated with repeated exposure to the contamination at the Casino Site and the Waterfront Parcels.

16.     The contamination at the Casino Site and the Waterfront Parcels has also negatively affected Mr. Gallagher's aesthetic enjoyment of the scenery from the Gwynns Falls Trail, including the views of the Middle Branch from the portion of the Trail along the Waterfront Parcels.  Mr. Gallagher would like to see clean and fishable waters in the Middle Branch.  If he knew that the contamination at the Casino Site and the Waterfront Parcels was fully addressed and remediated, he would recreate and use the portion of the Gwynns Falls Trail on and around the Waterfront Parcels more often and he would feel safer while walking through the area.  If he knew that the ongoing migration of contamination into

the Middle Branch was addressed and controlled, he would also derive greater enjoyment from such recreation and use.

17.     Plaintiff Tim Bull is, and at all times relevant to this Complaint was, a resident of Baltimore City.  Mr. Bull enjoys fishing and boating in and around the Baltimore Harbor, including in and around the Middle Branch area in the vicinity of the Casino Site and the Waterfront Parcels.  Mr. Bull also enjoys fishing with his son and teaching his son to fish; however, he does not take his son to fish in nearby Middle Branch area.  Instead, Mr. Bull travels to the Magothy River in Pasadena, Maryland, approximately 20 miles south of his residence or the Choptank River Fishing Pier State Park in Cambridge, Maryland, approximately 65 miles south of his residence because of his fears and concerns regarding the adverse health effects associated with his son's exposure to the contamination in the Middle Branch.

18.     Mr. Bull is concerned about the health of the fish and other aquatic species in the Middle Branch and the water quality of the Middle Branch itself.  Mr. Bull is concerned that contamination migrating into the Middle Branch from the Casino Site will continue to degrade the Middle's Branch water quality and ecosystem.  These concerns have negatively impacted his ability and/or desire to fish and boat in the area.  Although Mr. Bull currently recreates and/or fishes in the Middle Branch area of the Patapsco River approximately every five (5) months, he would recreate in and around the Middle Branch more frequently and would derive greater enjoyment from doing so if he knew that the ongoing of migration of contamination from the Casino Site was addressed and remediated.  If Mr. Bull knew that the Middle Branch area was safe for recreational use, he would feel comfortable teaching his son to fish in the Middle Branch, which is a more convenient location in relation to their Westport home than the current areas 20 to 65 miles south of their home that they travel.

19.     Plaintiff, Ruth Sherrill is, at all times relevant to this lawsuit was, a resident and property owner in the Westport neighborhood in Baltimore City.   Ms. Sherrill has lived in the Westport neighborhood for 75 years and has visited the area in question. Ms. Sherrill is an active member of her community and the president of the Westport Improvement Association, an association dedicated to improving the quality of life, health, environment, safety and economic opportunities of the neighborhood.  The Association also serves to keep residents informed and engaged in civil affairs that affect them and their neighborhood.  Ms. Sherrill enjoys the greenery and water views in and around the Gwynns Falls Trail.   She is alarmed about the existing contamination at the Casino Site and the Waterfront Parcels and that MDE and Baltimore City is allowing the contamination to continue migrating from the Casino Site into the Waterfront Parcels and the Middle Branch.  Ms. Sherrill is also concerned about the risks associated with being exposed to the contaminants emanating from the Casino Site and the Waterfront Parcels.  If Ms. Sherrill knew that the area in question was safe for human use, she would use and enjoy the area in the future.

20.     Plaintiff, Sherry Moore-Edmonds is, and at all times relevant to this Complaint was, a resident of the Westport neighborhood in Baltimore City.  Mrs. Moore-Edmonds is concerned about the contamination at the Casino Site and the Waterfront Parcels and the ongoing migration of contamination into the Middle Branch.  Mrs. Moore-Edmonds has used the portion of the Trail along the Waterfront Parcels and the open space area in and around its vicinity for recreation purposes.  Mrs. Moore-Edmonds is concerned about the human health risks associated with being exposed to the contamination in the area in question.  If she knew that the contamination at the Casino Site and the Waterfront Parcels was fully addressed and remediated, she would feel safer about recreating in the vicinity of the area in question and she would derive greater enjoyment from such recreation and use.

21.     Plaintiff, Merab Rice is, and at all times relevant to this Complaint was, a resident of the Westport neighborhood in Baltimore City.  Ms. Rice's children frequently use and recreate along the Gwynns Falls Trail, including the portion of the Trail along the Waterfront Parcels.  Ms. Rice is alarmed about the contamination at the Casino Site and the Waterfront Parcels and the ongoing migration of contamination into the Waterfront Parcels and Middle Branch.  She is also concerned about her health and her children's health and the risks associated with being exposed to the contamination at the area in question.  If she knew that the contamination at the Casino Site and the Waterfront Parcels was fully addressed and remediated, she would feel safer about recreating in the area and she would derive greater enjoyment from such recreation and use.  If she knew the contamination was fully addressed and remediated, she would also feel safer about allowing her children to frequent the area in question.

22.     Plaintiff Elizabeth Arnold is, and at all times relevant to this Complaint was, a resident and property owner in the Westport neighborhood of Baltimore City.  Like Ms. Sherrill, Mrs. Moore-Edmonds and Ms. Rice, Ms. Arnold is concerned about the presence of contamination at the Casino Site and the Waterfront Parcels and the ongoing migration of contamination into the Waterfront Parcels and Middle Branch.  Ms. Arnold is also an active member of the Westport Improvement Association and is alarmed about the lack of disclosure about the contamination at the Casino Site and Waterfront Parcels. If she knew that the contamination at the Casino Site and the Waterfront Parcels was fully addressed and remediated, she would feel safer about using the area in question and she would derive greater enjoyment from such recreation and use.

23.     Plaintiff Julia Dinkins is, and at all times relevant to this Complaint was, a resident and property owner in the Cherry Hill neighborhood of Baltimore City.  Ms. Dinkins is concerned about the continued presence of contamination at the Casino Site and the Waterfront Parcels and the ongoing

migration of contamination into the Waterfront Parcels and Middle Branch. If she knew that the contamination at the Casino Site and the Waterfront Parcels was fully addressed and remediated, she would feel safer about using the area in question and she would derive greater enjoyment from such recreation and use.

24.     Defendant Maryland Chemical Company, Inc. ("Maryland Chemical") is a Corporation organized under the laws of the State of Maryland with its principal place of business listed at 3310 Childs Street, Baltimore, Maryland 21226.

25.     Maryland Chemical is the past operator of the portion of the Casino Site located at 1501, 1525 and 1551 Russell Street (commonly referred to as the "Russell Street Properties").

26.     From since at least 1952 through September 2008, Maryland Chemical operated a chemical manufacturing facility and/or a bulk chemical storage, repackaging and distribution facility at the Russell Street Properties.

27.     Defendant Mayor and City Council of Baltimore (the "City" or "Baltimore City") is the body corporate for the City of Baltimore and a political subdivision of the State of Maryland established by Article 1, Section 1 of the Charter of Baltimore City.

28.     Defendant City is the past and present fee simple owner of the Casino Site and the Waterfront Parcels.  Specifically, Defendant City is the present fee simple owner of the Russell Street Properties and the (6) parcels of property comprising the Waterfront Parcels (designated as Lots 5A, 6, 7 and 8/9 on Map 21, Section 9, Block 844A and Lots 14 and 15 on Map 21, Section 9, Block 840).

29.     Defendant City acquired the parcels compromising the Waterfront Parcels in three (3) separate transactions on or around March 13, 1978, October 26, 1994, and April 24, 1996.

30.     Defendant City purchased the parcels compromising the Casino Site in four (4) separate transactions on or around April 27, 1976, October 26, 2005, May 5, 2008 and December 4, 2009.

31.     Defendant City of Baltimore Development Corporation ("BDC") is a 501(c)(3) Corporation organized under the laws of the State of Maryland with its principal place of business listed at 2537 St. Paul Street, Baltimore, Maryland 21218.  Defendant BDC was organized to implement, oversee and encourage public and private development and rehabilitation projects in Baltimore City and to facilitate and coordinate development efforts between the public and private sector.

32.     BDC was the past operator of the Casino Site during the period in which the City owned the Casino Site and while the City and BDC were actively pursuing a future developer for the Casino Site.

33.     Defendant CBAC Gaming, LLC ("CBAC Gaming") is a Limited Liability Company ("LLC") organized under the laws of the State of Delaware.  CBAC Gaming is registered to do business in the State of Maryland as a foreign LLC with its principal place of business listed at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

34.     CBAC Gaming is a consortium of investors formed to develop and operate the proposed Horseshoe Baltimore Casino.  CBAC Gaming's investors include Caesars Entertainment, Rock Gaming, LLC, CVPR Gaming Holdings, LLC, STRON-MD Limited Partnership and PRT TWO, LLC.

35.     CBAC Borrower, LLC ("CBAC Borrower") is a LLC organized under the laws of the State of Delaware.  CBAC Borrower is registered to do business in the State of Maryland as a foreign LLC with its principal place of business listed at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  CBAC Borrower is an indirectly wholly-owned subsidiary of CBAC Gaming.

36.     On or around October 31, 2012, CBAC Gaming entered into an agreement with Baltimore City to construct, develop and operate the proposed Horseshoe Baltimore Casino and ancillary facilities at the Casino Site.

37.     Pursuant to the terms of the agreements between CBAC Gaming, CBAC Borrower and Baltimore City, CBAC Gaming is the present operator of the Casino Site and CBAC Borrower is the present fee simple owner of the parcels of the Casino Site located at 1501, 1601, 1629, 1633, and 1645 Warner Street, 2119 Haines Street, 2104 Worcester Street and 2102 Oler Street (commonly referred to as the "Warner Street Properties").  Pursuant to the terms of Defendants' agreements, Baltimore City will retain ownership of the Russell Street Properties during CBAC Gaming's future operations pursuant to a lease agreement with CBAC Gaming and/or CBAC Borrower.

## FACTUAL BACKGROUND

A.     **The Subject Area: Casino Site And The Waterfront Parcels.**

38.     The Casino Site and the Waterfront Parcels are situated immediately northwest of the Middle Branch of the Patapsco River, a surface water body that discharges into the Chesapeake Bay.

39.     The Middle Branch is within the larger Baltimore Harbor watershed and is designated by MDE as a water body that must be protected for water contact recreation, fishing, aquatic life, and must be supportive of estuarine and marine aquatic life and shellfish harvesting.

40.     The Baltimore Harbor is currently designated by MDE as a "Priority Category 1 Watershed" based on its failure to attain the applicable water quality standards and/or goals for the designated uses described in paragraph 39 above.

41.     The Casino Site consists of eleven (11) separate parcels of land totaling approximately 8.58 acres.  The Casino Site is surrounded by the Middle Branch and the Waterfront Parcels on three sides.

42.     The Waterfront Parcels consists of six (6) parcels of protected open space area totaling approximately 9.25 acres.  The Waterfront Parcels is surrounded by the Middle Branch on three sides and by the Casino Site to the northwest.

43.     The Waterfront Parcels contain an asphalt recreational path which is used by the public for biking, running and walking and connects to the City's comprehensive Gwynns Falls Trail System. The shoreline area of the Waterfront Parcels contain wildlife habitat and is protected as a "Designated Habitat Protection Area" for migratory waterfowl under the City's Critical Area Program.

44.     The topography of the Casino Site and the Waterfront Parcels slopes downward to the southeast and, as a result, area groundwater and surface water flows downgradient towards the south and southeast and discharges into the Middle Branch of the Patapsco River.

45.     Based on the elevation of the Casino Site and the Waterfront Parcels at approximately 10 feet above sea level, the groundwater in the area is relatively shallow at depths ranges from approximately 4 to 12 feet.  As a result, contaminants in the subsurface soils come in contact with and contaminate the groundwater beneath the Casino Site and the Waterfront Parcels.

46.     The Middle Branch and its shoreline areas have been the target of federal, state and local environmental protection and economic revitalization efforts in recent years.  As part of these efforts, Baltimore City developed the Middle Branch Master Plan for purposes of protecting and improving the waters and habitat of the Middle Branch and increasing recreational and tourism opportunities in the Middle Branch and its shoreline areas.   The Middle Branch Master Plan's stated "overall goal" is to

restore the water quality of the Middle Branch to the Clean Water Act's fishable and swimmable standards by 2020.

47.     As alleged herein, Defendants' are past and present owners of and/or operators at the Casino Site and the Waterfront Parcels and, by their acts and omissions, have caused and contributed to the imminent and substantial endangerment to human health and the environment which is present at the Casino Site and the Waterfront Parcels.   Defendants' past and present hazardous waste disposal activities at the Casino Site have violated numerous federal and state hazardous waste management laws and regulations and have contributed to the imminent and substantial endangerment which is the subject of this action.

**B.     The Failure To Remediate Past Spills And Releases At The Casino Site Which Was Known To Be Migrating Off-Site.**

48.     The parcels which comprise the Casino Site have been owned and/or occupied for various industrial uses from at least the early 1900's through 2008.

49.     The Russell Street Properties were occupied by Maryland Chemical for chemical manufacturing and/or bulk chemical storage, repackaging and distribution purposes since at least 1952 through on or around November 2008.

50.     Maryland Chemical's operations at the Russell Street Properties involved a variety of chlorinated VOCs, metals, acids, bases and other organic and inorganic compounds including, but not limited to, trichloroethylene ("TCE"), tetrachloroethylene ("PCE"), cyclohexane, acetone, methylene chloride, hydrochloric acid, hydrofluoric acid, nitric acid, sulfuric acid, ammonia and ammonium-containing compounds, manganese and magnesium-containing compounds, pesticide products and chelating agents.

15

51.     Maryland Chemical's past operations at the Russell Street Properties resulted in spills and releases of hazardous substances and/or hazardous wastes including, but not limited to: at least one (1) TCE spill of an unidentified quantity in the northern portion of 1551 Russell Street (at or around the former Maryland Chemical storage yard); at least two (2) PCE spills of unidentified quantities in the northern portions of 1551 and 1525 Russell Street (at or around the former Maryland Chemical loading area, paint storage area and hazardous waste storage area); and at least one (1) release of petroleum compounds containing diesel range organics ("DROs") and polycyclic aromatic hydrocarbons ("PAHs") (including, but not limited to, acenaphthene, anthracene, benzo(a)pyrene, cyrsene, dibenzo(a,h)anthracene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, fluroanthene, fluorene, phenanthene and pyrene) from an underground storage tank ("UST") containing diesel fuel oil located at the southern portion of 1501 Russell Street.

52.     According to environmental assessments prepared on behalf of Maryland Chemical from on or around May 1997 through December 2000 (the "Glose Environmental Assessments"), prior PCE spills and/or releases at the Russell Street Properties created a "plume of chlorinated VOC contamination" consisting of PCE and its breakdown constituents (TCE, DCE, DCA, chloroform and vinyl chloride) (hereinafter the "PCE plume") in the groundwater beneath 1551 Russell Street at concentrations of more than **5,800 times** the applicable federal and state cleanup standards. See Exhibit 1.

53.     The Glose Environmental Assessments determined that the PCE plume was migrating in the groundwater in a south and southeasterly direction off-site and towards the Waterfront Parcels and Middle Branch of the Patapsco River.

54.     The Glose Environmental Assessments also identified petroleum compounds containing DROs in the groundwater beneath the southern portion of 1501 Russell Street at concentrations which were more than **40 times** the applicable federal and state cleanup standards.

55.     Notwithstanding the contamination identified in the Glose Environmental Assessments, including the migrating PCE plume at 1551 Russell Street, Maryland Chemical has not taken any action to control, mitigate, abate, remediate or remove the groundwater and soil contamination at the Russell Street Properties.

56.     The VOCs and petroleum compounds containing DROs and PAHs in the soils and groundwater at and under the Russell Street Properties are a continuing source of contamination at the Casino Site which has migrated and continues to migrate off-site and into the Waterfront Parcels and the Middle Branch.

**C.      The Failure To Remediate Environmental Contamination At The Waterfront Parcels Which Is Known To Present Unacceptable Human Health Risks.**

57.     On or before September 2004, Baltimore City proposed a trail expansion project and a wetland restoration project at the Waterfront Parcels.  The trail expansion project was completed on or before September 2005 and included the construction of an asphalt biking/pedestrian trail and two footbridges across the Alluvion and Bayard Street docks which connect the Waterfront Parcels to the larger Gwynns Falls Trail System.

58.     On or before September 2005, Baltimore City and BDC applied to the U.S. Army Corps of Engineers ("USACE") for federal funding from the Chesapeake Bay Environmental Restoration and Protection Program, Section 510 of Water Resource Development Act ("WRDA") 1996, as amended by Section 5020 of WRDA 2007, to complete the proposed wetland restoration project at the Waterfront Parcels.

59.    In order to address the USACE's stated concerns regarding the environmental contamination at the Waterfront Parcels, MDE conducted an environmental assessment at the Waterfront Parcels at BDC's request on or around October 2005 (the "Warner Street Wetlands Environmental Investigation").

60.    The sampling results from the Warner Street Wetlands Environmental Investigation identified various semivolatile organic compounds ("SVOCs"), including PAHs, and heavy metals in the surface and subsurface soils and groundwater at the Waterfront Parcels at concentrations above the applicable federal and state cleanup standards and/or regulatory limits (including, without limitation, aluminum, antimony, arsenic, chromium, lead, magnesium, manganese, silver, nickel, vanadium, zinc, 1,4-diclorobenzene, acenaptithene, anthracene, benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, flouroanthene, fluorene, idento(1,2,3-cd)pyrene, phenanthrene, pyrene and napthalene).

61.    The same PAHs that were identified as sources of contamination at the Russell Street Properties were also identified in the soils and/or groundwater, at and beneath the Waterfront Parcels.

62.    The Warner Street Wetlands Environmental Investigation did not analyze the soil or groundwater samples for the VOCs which were previously identified in the soils and groundwater at and under the Russell Street Properties (i.e., PCE, TCE and its breakdown constituents).

63.    Warner Street Wetlands Environmental Investigation's toxicological evaluation concluded that incidental ingestion and dermal contact with PAH and heavy metal contaminants in the soils at the Waterfront Parcels presented an unacceptable human health risk for multiple population groups including child and, youth visitors and adult workers.

18

64.     Based on the findings and conclusions in the Warner Street Wetlands Environmental Investigation, MDE concluded that remedial action (including, but not limited to, removing the top six (6) feet of contaminated soil from the Waterfront Parcels) was necessary before Baltimore City and BDC could proceed with the proposed wetland restoration project.

65.     Shortly after MDE issued the Warner Street Wetlands Environmental Investigation, Baltimore City and BDC abandoned the wetland restoration project at the Waterfront Parcels.

66.     Defendant City and Defendant BDC did not address, mitigate, abate, remediate or remove the contaminated soils from the Waterfront Parcels as recommended by MDE.

67.     On or around January 15, 2009, MDE directed Baltimore City to fully assess the nature and extent of the contamination at the Waterfront Parcels, which remained unremediated and which continued to pose unacceptable human health risks, and address any and all identified unacceptable risks.

68.     In response to MDE's January 15, 2009 letter, Baltimore City did not conduct any additional environmental assessments and did not obtain any additional soil or groundwater samples at the Waterfront Parcels.  Instead, on or around February 26, 2010, Baltimore City submitted a remedial action plan to MDE which proposed removing two (2) feet of soil at four (4) limited "target areas" at the Waterfront Parcels which previous samples had identified as containing the highest concentrations of arsenic and PAHs.

69.     On or around May 5, 2010, MDE informed Baltimore City that its proposed remedial action plan was "inadequate for achieving the stated goal of addressing contaminants in the site's soils in a manner that will reduce the risk to human health" because removing "four areas of contaminated soils neglects the presence of contaminants in the remainder of the soil covering the site and the potential

19

health impacts associated with them" and because "the approach incorrectly assumes the contaminant conditions at the 5.3-acre [Waterfront Parcels] have been fully characterized and the hot spots targeted for removal represent the primary areas of environmental concern."

70.     MDE's May 5, 2010 correspondence also informed Baltimore City that there was "insufficient soil gas and groundwater sampling data" to determine whether the VOC contamination identified in the soil gas and groundwater at the upgradient Casino Site was "migrating onto the [Waterfront Parcels] at levels of concern" and therefore, MDE recommended "the collection of a few soil and groundwater samples along the [Waterfront Parcels'] northwest boundary" to assess and control the risks associated with the potential for human exposure to VOCs.

71.     Baltimore City did not and has not taken any actions in response to MDE's May 5, 2010 letter including controlling, mitigating, abating, remediating or removing the soil or groundwater contamination at the Waterfront Parcels (whether sufficiently or insufficiently to reduce the known unacceptable human health risks.)    Baltimore City also has not taken any actions to assess potential migration of VOC contamination from the Casino Site into the Waterfront Parcels as directed by MDE.

**D.     The Failure To Address And/Or Control The Known Off-Site Migration Environmental Contamination From The Casino Site.**

72.     On or around April 25, 2008 and June 4, 2009, Baltimore City and BDC submitted two applications to the Maryland Voluntary Cleanup Program ("VCP") which proposed to remediate the Russell Street Properties and the Warner Street Properties, respectively (the "BDC VCP Applications").

73.     The environmental assessments prepared as part of the BDC VCP Applications confirmed that the unremediated spills and/or releases of VOCs and petroleum compounds containing DROs and PAHs during Maryland Chemical's past operations at the Russell Street Properties are

20

continuing sources of contamination in the groundwater, soil and/or soil vapor at and around the Casino Site at levels well above applicable federal and state cleanup standards and/or regulatory limits.

74.     VOCs persist in groundwater for long periods of time. VOCs also evaporate (or "volatize") from soils and surface waters and therefore are commonly found as a vapor in the air.

75.     The BDC Environmental Assessments identified concentrations of PCE and TCE in the groundwater beneath the source area of the PCE plume at 1551 Russell Street at **400 times** the applicable federal and state cleanup standards.  Concentrations of PCE and TCE were also detected immediately downgradient from the Russell Street Properties to the south and southeast of the source area of the PCE plume at more than **100 times** the applicable federal and state cleanup standards.

76.     The BDC Environmental Assessments detected VOCs (including, but not limited to, PCE, TCE, TCA, chloroform, vinyl chloride, cis-1,2-dichloroethene, and trans-1,2-dichloroethene) in the soil vapors in and around the source area of the PCE plume at the Russell Street Properties at concentrations as high as **3,000 times** the applicable federal and state risk-based standards.  VOCs (including, but not limited to, TCE, chloroform, vinyl chloride, cis-1,2-dichloroethene hexane and pentane) were also detected in the soil vapors immediately downgradient from the Russell Street Properties and directly south of the source area of the PCE plume at concentrations as high as **800 times** the applicable federal and state risk-based standards.

77.     According to the BDC Environmental Assessments, the PCE plume at the Russell Street Properties has caused "hot spots" (i.e., highly concentrated concentrations of contaminants at various depths and various locations) in the surface and subsurface soils throughout the Russell Street Properties which would render the soils to be considered "hazardous waste", as defined under applicable federal and state hazardous waste laws, once excavated.

78.     The BDC Environmental Assessments also confirmed the continued migration of PAHs (including, but not limited to, acenapthene, anthracene, benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, flouroanthene, fluorene, phenanthrene and pyrene) in the groundwater beneath the source area of the release of petroleum compounds containing DROs and PAHs at the Russell Street Properties in the downgradient groundwater at concentrations as high as **600 times** the applicable federal and state cleanup standards. DROs were also detected in the downgradient groundwater at more than **2,300** times the applicable federal and state cleanup standards.

79.     The concentrations of certain PAHs were detected in the downgradient groundwater were as high as **16,000** times the applicable federal and state risk-based standards.

80.     The BDC Environmental Assessments also identified heavy metal contamination in the surface and subsurface soils and groundwater at the Casino Site (including, but not limited to, antimony, aluminum, arsenic, cadmium, chromium, lead, manganese, nickel, thallium, mercury, silver and vanadium) at concentrations above the applicable federal and state cleanup standards and/or regulatory limits.  "Hot spots" of arsenic, cadmium, chromium, lead, mercury and silver were also identified in the surface and subsurface soils throughout the Casino Site.

81.     On or around October 2012, CBAC Gaming entered into an agreement with Baltimore City to develop, construct and operate the proposed Horseshoe Baltimore Casino and ancillary facilities at the Casino Site.  Pursuant to the parties' agreements, CBAC Gaming also agreed to enroll in the VCP and remediate the Casino Site.

82.     On or around the same time, CBAC Gaming submitted a VCP application to MDE to remediate the Casino Site.

83.     The remedial measures contained in the RAP submitted by CBAC Gaming and approved by the MDE VCP (the "CBAC RAP") are limited to (1) "capping" the soil contamination at the Casino Site with standard construction materials (i.e., concrete, asphalt or landscaping) after future construction activities are completed; (2) installing a vapor mitigation system under the building proposed to be constructed on the Russell Street Properties; and (3) recording a groundwater use restriction in the land records.

84.     The CBAC RAP does not require the excavation and removal of any of the hazardous soils, in and around the source areas of the PCE plume, including the areas of known hot spots.  The CBAC RAP also does not require construction techniques to prevent the movement of stormwater and/or surface water runoff into known hot spots and/or to control off-site migration issues into the Waterfront Parcels and the Middle Branch.

85.     As authorized by the terms of the RAP, excavated soils at the Casino Site have been and will continue to be disposed of on-site by backfilling and regrading previously excavated soils and then covering the contaminated soils with the proposed "cap."

86.     The CBAC RAP contains no requirement to remedy, sample or otherwise investigate whether VOCs are migrating off-site in the soil vapors above applicable federal and state cleanup standards and/or regulatory limits after construction activities are completed.

87.     Neither Baltimore City, BDC, nor CBAC Gaming have discussed or otherwise proposed to address to ongoing migration of contamination in the groundwater and soil vapors at the Casino Site and into the adjacent Waterfront Parcels and the Middle Branch of the Patapsco River.

88.     Neither Baltimore City, BDC, nor CBAC Gaming have discussed or otherwise proposed to address the known human health risks which remain unremediated at the Waterfront Parcels.

**E.      Current Construction Activities At The Casino Site Which Have Exacerbated And   Will Continue To Exacerbate The Off-Site Migration Of Contamination.**

89.     As alleged herein, Baltimore City, BDC and CBAC Gaming's recent construction activities at the Casino Site have contributed to and are continuing to contribute to the imminent and substantial endangerment which is present at the Casino Site and the Waterfront Parcels.

90.     While Baltimore City and BDC actively pursued a future developer for the Casino Site, the acts and/or omissions of Baltimore City and BDC caused and/or contributed to the contamination at the Casino Site.

91.     On or around May 2008 through December 31, 2009 and during Baltimore City and BDC's ownership and/or operation of the Casino Site, Baltimore City and BDC allowed illegally stored and/or abandoned drums containing hazardous wastes to leak, spill and/or otherwise release into the Casino Site.

92.     On or before March 2009 through December 31, 2009, and during Baltimore City and BDC's ownership and operation of the Casino Site, Baltimore City and BDC excavated, moved, mixed, stockpiled, backfilled and/or graded contaminated soils and groundwater at the Casino Site in order to, among other things, address abandoned pits used during previous industrial operations which contained contaminated groundwater and/or rainwater and remove at least one (1) UST located at the Russell Street Properties.

93.     Baltimore City and BDC's construction activities included excavating, moving, mixing, backfilling and/or grading contaminated soils and/or groundwater located in and around known hot spots of PCE, TCE and heavy metals.

94.     On or before March 2013, CBAC Gaming commenced construction and "remediation" activities at the Casino Site.  Construction activities at the Casino Site are expected to continue through at least August 2014.

95.     Since on or around March 2013 through at least July 31, 2013, CBAC Gaming has excavated, moved, mixed, stockpiled, backfilled and/or graded contaminated soils and groundwater at the Casino Site in order to, among other things, investigate and remove at least thirteen (13) historic USTs at the Casino Site, remove existing utilities and foundations (including building footers and concrete slabs) and install new utilities and foundations at the Casino Site.

96.     CBAC Gaming's construction activities have and/or will involve the excavation of subsurface soils as deep as 60 feet beneath the surface of the Casino Site in order to install foundation pilings for proposed structures and buildings.

97.     CBAC Gaming's construction activities have excavated, moved, mixed, stockpiled, backfilled and/or graded contaminated soils and/or groundwater located in and around known hot spots of PCE, TCE and heavy metals.

98.     Notwithstanding the known hot spots at the Casino Site, CBAC Gaming has stored, mixed and disposed of contaminated soils on-site by backfilling and regrading excavating soils into and/or onto the Casino Site.

99.     CBAC Gaming's future construction plans are proposed to extend into the Waterfront Parcels in order to construct an access road connecting the Trail with the future parking garage and to plant trees and shrubbery necessary to satisfy CBAC Gaming's mitigation requirements under the Critical Area Act.

100.    Although CBAC Gaming's construction plans at the Waterfront Parcels include the excavation, movement and grading of contaminated soils which are known to be contaminated at levels which present unacceptable human health risks, neither the City nor CBAC Gaming has enrolled the Waterfront Parcels into the VCP and/or submitted the proposed construction plans to the VCP for approval.  CBAC Gaming's construction plans also do not include any remedial measures to control, mitigate, prevent or otherwise address the risks associated with increasing human exposure to contaminated soils which already exceed applicable federal and state risk-based standards.

101.    The past, present and future construction activities described in paragraphs 90 through 100 above have caused, contributed to and/or exacerbated and will continue to cause, contribute to

and/or exacerbate the contamination in the soils and groundwater at the Casino Site and the Waterfront Parcels and the ongoing migration of contamination off-site by, among other things, excavating, moving and mixing hot spots of contamination and/or exposing contaminants in and under the Casino Site and the Waterfront Parcels to increased infiltration of rain water.

**F.      The Imminent And Substantial Endangerment To Human Health And The Environment Which Is Present At The Casino Site And The Waterfront Parcels.**

102.     As alleged herein, the VOC, PAH and heavy metal contamination in the soils and groundwater at the Casino Site, which have migrated and will continue to migrate in the soils, soil vapors and/or groundwater off-site and into the surrounding areas, including the Waterfront Parcels and the Middle Branch, presents a imminent and substantial risk to human health and the environment.

103.     VOCs which have migrated and will continue to migrate in soil vapors off-site and into the surrounding areas at concentrations above, applicable federal and state cleanup standards and/or risk-based standards presents imminent and substantial risk to human health in and around the Casino Site (including, but not limited to, the workers and visitors in the areas and buildings in the vicinity of the Russell Street Properties).

104.     The human health effects associated with breathing small amounts of VOCs include headaches, nausea, lung irritation, dizziness, confusion, poor coordination, and difficulties with speaking, walking, and concentrating.  The health effects associated with breathing VOCs for longer periods of time include nerve, kidney and liver damage, impaired heart function, unconsciousness and death.

105.     Long terms exposure to TCE, vinyl chloride, and 1,2-dichloroethene, which are known or probable human carcinogens, may also cause cancer.

27

106.    The ongoing migration of contamination groundwater (including, but not limited to, VOCs, PAHs, and/or heavy metals) from the Casino Site and into the Middle Branch at concentrations above the applicable federal and state cleanup standards, risk-based standards, and/or regulatory limits also presents an imminent and substantial risk to human health and/or the aquatic environment.

107.    According to recent sampling conducted in April 2013 along the shoreline of the Middle Branch and immediately downgradient from the Waterfront Parcels (the "April 2013 Waterfront Sampling"), the soils and groundwater in the channel ward of the Waterfront Parcels are contaminated with the same PAHs, DROs and heavy metals which have been identified as sources of contamination at and under the Casino Site (including, but not limited to, acenaphthene, anthracene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, fluoranthene, fluorene, phenanthrene, pyrene, aluminum, antimony, arsenic, cadmium, chromium,  lead, manganese, mercury, nickel and silver).

108.    The April 2013 Waterfront Sampling identified the same PAHs and heavy metals at concentrations of more than **1,000 times** more than the applicable federal and state cleanup and more than **12,000** times the federal and state risk-based standards.

109.    The highest concentrations of PAHs which were detected in the channel ward of the Waterfront Properties were located in the soils and groundwater immediately downgradient from the source area of the release of petroleum compounds containing DROs and PAHs at the Russell Street Properties.

110.    Concentrations of PAHs are generally highest in sediments of the aquatic ecosystem.  As a result, aquatic invertebrates are particularly susceptible to PAH contamination.

28

111.    Adverse effects of PAH contamination on aquatic invertebrates include inhibited reproduction, delayed emergence, sediment avoidance, liver neoplasms and other abnormalities and mortalities.

112.    Heavy metals bioaccumulate in muscle tissue and therefore heavy metal contamination in in the aquatic environment can cause various adverse health effects to the aquatic ecosystem and to humans through fish consumption.

113.    The PAH contamination in the soils and/or groundwater at the Waterfront Parcels, which are at concentrations well above applicable federal and state cleanup standards, risk-based standards and/or regularly limits,  have presented and continue to present an imminent and substantial risk to the health of the visitors and works that use or work in and around the subject area.

114.    The health effects associated with short-term exposure to PAHs via incidental skin contact and/or ingestion include nausea, vomiting, diarrhea, confusion and skin irritation (e.g., redness, inflammation, blistering, and peeling).

115.    PAHs can be absorbed through the skin and therefore, long-term health effects can also include cataracts, organ (e.g., lung, liver and kidney) damage and cancer.

### COUNT I
### RCRA, 42 U.S.C. § 6972(a)(1)(A)
### (Defendants Baltimore City, CBAC Gaming, and CBAC Borrower)

116.    Plaintiffs adopt and hereby incorporate the allegations of Paragraphs 1 through 115 of the Complaint as if fully set forth herein.

117.    By virtue of the acts and/or omissions described herein, Baltimore City, CBAC Borrower and CBAC Gaming are the current owners and operators of an unpermitted hazardous waste, treatment, storage or disposal facility, as those terms are defined in 40 C.F.R. §260.10 and COMAR 26.13.01.03B.

118.    By virtue of the construction activities described in paragraphs 90-100 above, Baltimore City and CBAC Gaming generated "solid waste" and/or "hazardous waste," as those terms are defined in 40 C.F.R. § 261.2; Md. Code Ann., Envir., §7-201; COMAR 26.13.01.03B, COMAR 26.13.02.02 and COMAR 26.13.02.03.

119.    After generating solid waste and/or hazardous waste during the construction activities described in paragraphs 90 through 100 above,  Baltimore City and CBAC Gaming failed to determine whether the waste was hazardous, in violation of 40 CFR § 262.11 and COMAR 26.13.03.02.

120.    By virtue of the construction activities described in paragraphs 90 through 100 above (including, but not limited to, mixing, moving, stockpiling, grading and/or backfilling contaminated soils and/or groundwater), Baltimore City and CBAC Gaming "treated", "stored" and/or "disposed" of hazardous waste at the Casino Site, as those terms are defined in 40 C.F.R. § 260.10 and COMAR 26.13.01.03B.

121.    The Casino Site is not, and has never been, a permitted hazardous waste treatment, storage or disposal facility.

122.    Baltimore City and CBAC Gaming treated, stored, disposed of, and/or transported hazardous wastes during the construction activities described in paragraphs 90 through 100 above, without complying with the applicable generator standards, in violation of 40 C.F.R. §§ 262.20 through 260.44; COMAR 26.13.03.01 through 26.13.03.06, and Md. Code Ann., Envir., § 7-224.

123.    Baltimore City, CBAC Gaming and CBAC Borrower have not and have never obtained a permit to own and/or operate a hazardous waste treatment, storage or disposal facility at the Casino Site as required by Md. Code Ann., Envir., § 7-232 and COMAR 26.13.07.01A.

124.    By virtue of the construction activities described in paragraphs 90 through 100 above, Baltimore City, CBAC Borrower and CBAC Gaming owned/or operated an unpermitted hazardous waste treatment, storage or disposal facility without complying with the applicable facility standards and permit requirements, in violation of Md. Code Ann., Envir., §§ 7-224, 7-232; COMAR 26.13.05.01 through 26.13.05.05 and COMAR 26.13.07.01.

125.    The violations of Baltimore City described in paragraphs 117 through 124 above have never been remedied and therefore, are ongoing.

126.    The violations of CBAC Gaming described in paragraphs 117 through 124 above have never been remedied and therefore, are ongoing.

127.    The violations of CBAC Borrower described in paragraphs 117 through 124 above have never been remedied and therefore, are ongoing.

128.    In accordance with 42 U.S.C. § 6972(a), Plaintiffs are entitled to an injunction prohibiting the continued violations described in paragraphs 117 through 124 above.

129.    In accordance with 42 U.S.C. § 6972(e), Plaintiffs are entitled to recover all costs of litigation, including reasonable attorney's fees and expert fees.

## COUNT II
## RCRA, 42 § U.S.C. 6972(a)(1)(B)
## (All Defendants)

130.    Plaintiffs adopt and incorporate the allegations of Paragraphs 1 through 129 of the Complaint as if fully set forth herein.

131.    Defendants Maryland Chemical, Baltimore City, BDC, CBAC Gaming, and CBAC Borrower are "persons" as that term is defined by COMAR 26.13.01.03B(61).

132.    Maryland Chemical is the past operator of the Russell Street Properties and a past generator of hazardous waste at the Russell Street Properties.

133.    By virtue of the releases and/or spills described in paragraph 51 above, Maryland Chemical disposed of hazardous waste, as those terms are defined in 40 C.F.R. §§ 260.10, 261.3, 261.33; COMAR 26.13.01.03B, COMAR 26.13.02.03 and COMAR 26.13.02.19, at a facility that was not, and has never been, a permitted hazardous waste treatment, storage or disposal facility.

134.    Maryland Chemical's past operations at the Russell Street Properties caused and/or contributed to the imminent and substantial endangerment to human health and the environment which is present at the Casino Site and the Waterfront Parcels by unlawfully spilling, releasing, and/or disposing of hazardous wastes and/or hazardous substances in the soils and groundwater at the Casino Site (including, but not limited to, PCE, TCE, and petroleum compounds containing DROs, aceaphthalene, anthracene, benzo(a)pyrene, cyrsene, dibenzon(a,h)anthracene, benzo(a)anthracene, benzo(b)fluroanthene, benzo(k)fluoranthene, fluroanthene, fluorene, phenanthrene, and pyrene) and by failing to address and/or remediate the contamination thereafter.

135.    The continued presence of VOCs and petroleum compounds containing DROs and PAH constituents which have remained in the surface and subsurface soils, soil vapors and/or groundwater at and beneath the Casino Site are a direct result of the acts and/or omissions of Maryland Chemical as described in paragraphs 132 through 134 above.

136.    Defendants City is the past owner and operator of the Warner Street Properties, the present owner of the Russell Street Properties and the present owner and operator of the Waterfront Parcels.  Defendant BDC is the past operator of the Casino Site.

137.    Baltimore City and BDC contributed to the imminent and substantial endangerment present at the Casino Site and the Waterfront Parcels during their ownership and operation of the Casino Site by excavating, moving, mixing, backfilling and/or grading contaminated soils and/or groundwater at the Casino Site, including in known "hot spots" of PCE, TCE and heavy metals, which exacerbated the known contamination at and under the Casino Site and/or the off-site migration of contamination in the soils, soil vapors and/or groundwater.

138.    Since acquiring ownership of the Waterfront Parcels, Baltimore City has also made no effort to control, mitigate, abate, remediate or remove the groundwater and/or soil contamination at the Waterfront Parcels which is known to present unacceptable human health risks.

139.    Defendant CBAC Gaming is the present operator of the Casino Site and Defendant CBAC Borrower is the present owner of the Warner Street Properties.

140.    CBAC Borrower and CBAC Gaming contributed to and are continuing to contribute to the imminent and substantial endangerment present at the Casino Site and the Waterfront Parcels by excavating, moving, mixing, backfilling and/or grading contaminated soils and/or groundwater at the Casino Site, including in known "hot spots" of PCE, TCE and heavy metals, which has exacerbated and continues to exacerbate the contamination at and under the Casino Site and/or the off-site migration of contamination in the soils, soil vapors and/or groundwater.

141.    The continuing sources of soil and groundwater contamination at and under the Casino Site (including, but not limited to PCE, TCE, TCA, DCE, chloroform, vinyl chloride, cis-1,2-dichloroethene, trans-1,2-dichloroethene, benzene, hexane, pentane, acenaphthene, anthracene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoroanthene, benzo(k)fluoroanthene, chrysene, dibenzo(a,h)anthracene, fluoranthene, fluorene, indeno(123-cd)pyrene, phenanthrene, pyrene,

napthanene, aluminum, antimony, arsenic, cadmium, chromium, iron, lead, manganese, mercury, nickel, silver, thallium, vanadium and zinc) and the ongoing migration of contamination off-site in the soils, soil vapors and/or groundwater, including into the Waterfront Parcels and the Middle Branch, at levels above the applicable federal and state cleanup standards, risk-based standards and/or regulatory limits are the direct result of Defendants' actions and omissions described in paragraphs 131 through 140 above.

142.    In accordance with 42 U.S.C. § 6972(a), Plaintiffs are entitled to an order awarding any and all relief that is necessary to remedy the contamination caused by Defendants' acts and/or omissions, including, but not limited to: (1) a comprehensive environmental investigation and assessment to determine the nature and extent of contamination which is migrating off-site and into the surrounding areas, including the Waterfront Parcels and the Middle Branch, and to determine to the nature and scope of the endangerment to human health and/or the environment (including the natural and ecological resources in and around the Middle Branch); (2) undertaking remedial measures to address, control and/or remove the contamination which is migrating off-site and contributing to the contamination at the Waterfront Parcels and/or Middle Branch, and/or which is contributing to the imminent and substantial endangerment to human health and/or the environment in and around the Casino Site; and (3) an injunction preventing further contaminant migration off-site through the soils, soil vapors and/or groundwater which may present an imminent and substantial endangerment to human health and/or the environment.

143.    In accordance with 42 U.S.C. § 6972(e), Plaintiffs are entitled to recover all costs of litigation, including reasonable attorney's fees and expert fees.

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Declare that the Casino Site constitutes an unpermitted hazardous waste, treatment, storage or disposal facility and that Defendants Baltimore City, CBAC Gaming and CBAC Borrower are in violation of applicable federal and state hazardous waste laws and regulations;

b.  Declare that the past and present acts and/or omissions of Defendants Maryland Chemical, Baltimore City, BDC, CBAC Gaming and CBAC Borrower have caused and/or contributed to then imminent and substantial endangerment to human health and/or the environment which is present at the Casino Site and the Waterfront Parcels;

c.  Order and enjoin Defendants Baltimore City, CBAC Gaming and CBAC Borrower to comply with applicable federal and state hazardous waste laws and regulations which have been violated and to refrain from taking any further activities at the Casino Site or the Waterfront Parcels until Defendants correct and/or remedy any and all violations and obtain any and all necessary permits and approvals;

d.  Order and enjoin Defendants Maryland Chemical, Baltimore City, BDC, CBAC Gaming and CBAC Borrower to conduct a comprehensive environmental investigation and assessment at the Casino Site and the Waterfront Parcels to determine the nature and extent of contamination which is migrating off-site, including into the Waterfront Parcels and the Middle Branch, and to determine to the nature and scope of the endangerment to human health and/or the environment which is presented by the contamination at and around the Casino Site and the Waterfront Parcels;

e.  Order and enjoin Defendants Maryland Chemical, Baltimore City, BDC, CBAC Gaming, and CBAC Borrower to take any and all remedial measures necessary to control, abate,

prevent or mitigate the ongoing migration of contamination from the Casino Site, including into the Waterfront Parcels and the Middle Branch, in the soils, soil vapors and/or groundwater and/or the imminent and substantial endangerment to human health and/or the environment which is present at and around the Casino Site and the Waterfront Parcels to levels which are protective of human health and the environment;

f.      Order and enjoin Defendants Maryland Chemical, Baltimore City, BDC, CBAC Gaming and CBAC Borrower to take any and all remedial measures necessary to remedy all contamination which has contributed to and is contributing to the contamination of the Waterfront Parcels and the Middle Branch;

g.      Civil penalties as authorized by § 7002(a) of RCRA, 42 U.S.C. 6972(a);

h.      Award Plaintiffs its reasonable litigation costs, including attorney's fees and experts fees; and

i.      Any other and further relief deemed just and equitable by this Court.

<u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury of all claims so triable as a matter of right.

Respectfully submitted,

_____/s/_____
Timothy Henderson, Federal Bar Id. No. 12569
thenderson@richlaw.com

_____/s/_____
Anthony Gorski, Federal Bar Id. No 22685
agorski@richlaw.com

36

RICH AND HENDERSON, P.C.
51 Franklin Street, Suite 300
P.O. Box 589
Annapolis, Maryland  21404-0589
410-267-5900
410-267-5901

*Attorneys for Plaintiffs*

Dated:  September 19, 2013