IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| RUTH SHERRILL, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. RDB-13-2768 |
| MAYOR AND CITY COUNCIL OF BALTIMORE, *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This case is yet another lawsuit challenging the siting and construction of the Horseshoe Casino in Baltimore, Maryland.[1]  Plaintiffs assert claims against the Mayor and City Council of Baltimore, City of Baltimore Development Corporation, CBAC Gaming, LLC, CBAC Borrower, LLC, and Maryland Chemical Company, Inc., arguing that the Defendants' various activities at the Site violated the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*  Various Defendants have filed Motions to Dismiss, and all motions are now fully briefed.  In addition, Plaintiffs have filed a Motion for Leave to File Sur-Reply as to the CBAC Defendants' Motion to Dismiss.  The parties' submissions have been reviewed and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2011).  For the reasons that follow, while the Plaintiffs' Motion for Leave to File Sur-Reply (ECF No. 33) is GRANTED, the Defendants CBAC Gaming, LLC and CBAC Borrower, LLC's Motion to

---

[1] The other cases in this Court were *Robinson, et al. v. Maryland Department of the Environment, et al.*, Civ. A. No. RDB-13-cv-2234, and *Richardson v. Mayor and City Council of Baltimore* (formerly *Myers v. Mayor and City Council of Baltimore*), RDB-13-cv-1924.  Both cases were dismissed.

Dismiss (ECF No. 11), Defendant Maryland Chemical Company, Inc.'s Motion to Dismiss (ECF No. 13), and Defendants Mayor and City Council of Baltimore and Baltimore Development Corporation's Motion to Dismiss (ECF No. 15) are GRANTED.

BACKGROUND

This Court accepts as true the facts alleged in the plaintiffs' complaint. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).

## I.  THE SITE

This lawsuit concerns various tracts of land in Baltimore City, Maryland where the Horseshoe Casino is currently under construction ("the Site").[2]  The Site is "situated immediately northwest of the Middle Branch of the Patapsco River" and adjacent to an area of protected open space (the "Waterfront Parcels").[3]  Pls.' Comp. ¶¶ 38, 42.   Plaintiffs allege that "past spills and releases of hazardous substances and/or hazardous wastes . . . have been left unaddressed and/or unremediated and, as a result, are a continuing source of contamination in the soils and groundwater at the Casino Site." *Id.* ¶ 2.  According to the Complaint, "[t]he topography of the Casino Site and the Waterfront Parcels slopes downward to the southeast and, as a result, area groundwater and surface water flows downgradient towards the south and southeast and discharges into the Middle Branch." *Id.*

---

[2] Specifically, the Site includes 1501, 1525, and 1551 Russell Street (the "Russell Street Properties"); 1501, 1601, 1629, 1633, and 1645 Warner Street; 2119 Haines Street; 2104 Worcester Street; and 2102 Oler Street (the "Warner Street Properties").

[3] The Waterfront Parcels "consist[] of six (6) parcels of protected open space area totaling approximately 9.25 acres" and are "surrounded by the Middle Branch of three sides and by the Casino Site to the northwest." Pls.' Compl. ¶ 42.  The Waterfront Parcels include an "asphalt recreational path . . . used by the public for biking, running and walking" and a shoreline area that "contain[s] wildlife habitat and is protected as a 'Designated Habitat Protection Area' for migratory waterfowl under the City's Critical Area Program. *Id.* ¶ 43.

¶ 44.  Due to this movement, Plaintiffs allege that contamination has "migrat[ed] off-site and into the adjacent public recreational areas" and the Middle Branch of the Patapsco River.  *Id.* ¶ 1.  It is further alleged that the Gwynns Falls Trail, an asphalt recreational path, runs through the Waterfront Parcels, and the shoreline areas of the Waterfront Parcels are "Designated Habitat Protection Area" for migratory waterfowl.  *Id.* ¶ 43.

## II.   <u>THE NAMED PLAINTIFFS</u>

Plaintiff Ruth Sherrill ("Sherrill") is the original lead plaintiff in this case and is joined in the suit by another seven (7) named plaintiffs (collectively, the "Plaintiffs").  The other named plaintiffs are Elizabeth Arnold ("Arnold"), Merab Rice ("Rice"), Sherry Moore-Edmonds ("Moore-Edmonds"), Tim Bull ("Bull"), Julia Dinkins ("Dinkins"), Bruce Goldfarb ("Goldfarb"), and Michael Gallagher ("Gallagher").  Goldfarb is "an avid photographer and journalist" who enjoys biking and taking photographs of the flaura and fauna along the Gwynns Falls Trail.  *Id.* ¶ 12.  Due to the contamination at the Site, however, Goldfarb does not stop for photographs near the Waterfront Parcel and refrains from bringing his children to bike along that portion of the Trail as well.  *Id.* ¶ 13.   Goldfarb alleges that, were the Waterfront Parcels safer for human use, he would visit those portions of the Trail.  *Id.* ¶ 14.

Gallagher is a resident of the Westport neighborhood of Baltimore City and uses the Gwynns Falls trail to travel into downtown Baltimore on occasion.  *Id.* ¶ 15.  Gallagher also uses the Trail "for exercise and for its waterfront views" and is concerned about the health risk posed by "repeated exposure to contamination" at the Site.  *Id.* ¶ 15.  Gallagher "would like to see clean and fishable waters in the Middle Branch" and "would recreate and use the

portion of the Gwynns Falls Trail on and around the Waterfront Parcels more often" if the Site were remediated.  *Id.* ¶ 16.

Bull is a resident of Baltimore City and "enjoys fishing and boating in and around the Baltimore Harbor" and the Middle Branch area.  *Id.* ¶ 17.  Allegedly, Bull "currently recreates and/or fishes in the Middle Branch area of the Patapsco River approximately every five (5) months."  *Id.* ¶ 18.  Although "he enjoys fishing with his son and teaching his son to fish," he travels to more distant locations to do so "because of his fears and concerns regarding the adverse health effects associated with his son's exposure to the contamination of the Middle Branch."  *Id.* ¶ 17.  If Bull knew the Middle Branch "was safe for recreational use, he would feel comfortable teaching his son to fish [there]."  *Id.* ¶ 18.

Sherrill, Moore-Edmonds, and Rice are residents of the Westport neighborhood of Baltimore City.  *Id.* ¶¶ 19-23.  According to the Complaint, Sherrill "enjoys the greenery and water views in and around the Gwynns Falls Trail."  *Id.* ¶ 19.  Moore-Edmonds "has used the portion of the Trail along the Waterfront Parcels and the open space area in and around its vicinity for recreation purposes."  *Id.* ¶ 20.  Meanwhile, "Rice's children frequently use and recreate along the Gwynns Falls Trail."  *Id.* ¶ 21.  All three are concerned about the health risks posed by the contamination at the Site.[4]  *Id.* ¶¶ 19-21.  If the area were remediated, Sherrill alleges that she would "use and enjoy the area in the future" while the Moore-Edmonds and Rice assert that they would "feel safer" recreating in the area and would "derive greater enjoyment" from such use if the Site were remediated.  *Id.* ¶¶ 19-21.

Arnold and Dinkins are also residents and property owners in nearby parts of

---

[4] Additionally, Rice is concerned about the health risks posed to her children.  *Id.* ¶ 21.

Baltimore City. Neither alleges any specific usage of the area in the immediate vicinity of the Site, but both profess concern about the contamination at the Site. *Id.* ¶¶ 22, 23. Additionally, both Arnold and Dinkins assert that they would "feel safer" recreating in the area and would "derive greater enjoyment" from such use. *Id.* ¶¶ 22, 23.

### III. <u>THE DEFENDANTS</u>

Plaintiffs have sued Maryland Chemical Company, Inc. ("Maryland Chemical"), the Mayor and City Council of Baltimore (the "City"), the City of Baltimore Development Corporation ("Baltimore Development Corp."), CBAC Gaming, LLC ("CBAC Gaming"), and CBAC Borrower, LLC ("CBAC Borrower").

Maryland Chemical is the past operator of a portion of the Site.[5] *Id.* ¶ 25. "From since at least 1952 through September 2008, Maryland Chemical operated a chemical manufacturing facility and/or a bulk chemical storage, repackaging and distribution facility" at the Site. *Id.* ¶ 26.

The City is the present owner of the Russell Street Properties and the Waterfront Parcels. *Id.* ¶ 28. The City "acquired the parcels comprising the Waterfront Parcel in three (3) separate transactions on or around March 13, 1978, October 26, 1993, and April 24, 1996." *Id.* ¶ 29. The Site parcels were acquired in four (4) separate transactions on or around April 27, 1976, October 26, 2005, May 5, 2008, and December 4, 2009. *Id.* ¶ 30. Baltimore Development Corp. is a 501(c)(3) corporation that was organized to facilitate public and private development projects in Baltimore City and was the past operator of the Site during

---

[5] Specifically, Maryland Chemical's facility operated at 1501, 1525, and 1551 Russell Street (the "Russell Street Properties"). *Id.* ¶ 25.

the period of the City's ownership.[6]  *Id.* ¶¶ 31-32.

CBAC Gaming is the present operator of the Site, while CBAC Borrower is the present owner of a portion of the Site.[7]  *Id.* ¶ 37.  CBAC Gaming is a foreign limited liability company formed to develop and operate the Horseshoe Casino.  *Id.* ¶ 34.  CBAC Borrower is a separate foreign limited liability company and is a indirectly wholly-owned subsidiary of CBAC Gaming.  *Id.* ¶ 35.  The City, CBAC Gaming, and CBAC Borrower entered into an agreement on or around October 31, 2012 in order to construct, develop, and operate the Horseshoe Casino.  *Id.* ¶¶ 36, 37.  The City maintains ownership over the Russell Street Properties under a lease agreement.  *Id.*

## IV.   MARYLAND CHEMICAL'S OPERATIONS AT THE RUSSELL STREET PROPERTIES AND THE ALLEGED RESULTING CONTAMINATION

As noted above, Maryland Chemical performed "chemical manufacturing and/or bulk chemical storage, repackaging and distribution" operations at the Site from at least 1952 until 2008.  *Id.* ¶ 49.  These operations involved a variety of chemical compounds, including "chlorinated VOCs, metals, acids, bases and other organic and inorganic compounds including, but not limited to, trichloroethylene ("TCE"), tetrachloroethylene ("PCE"), cyclohexane, acetone, methylene chloride, hydrochloric acid, hydrofluoric acid, nitric acid, sulfuric acid, ammonia and ammonium-containing compounds, manganese and magnesium-

---

[6] The City and the Baltimore Development Corp. filed a combined Motion to Dismiss.  The Motion does not distinguish between the entities with respect to liability, and the City has not contested that it would be liable for the actions of the Baltimore Development Corporation.  Accordingly, for purposes of these motions and this Memorandum Opinion, this Court treats the City and the Baltimore Development Corporation as synonymous.

[7] Specifically, CBAC Borrower is the owner of the Warner Street Properties, which consist of 1501, 1601, 1629, 1633, and 1645 Warner Street; 2119 Haines Street; 2104 Worcester Street; and 2102 Oler Street.  *Id.* ¶ 37.

containing compounds, pesticide products and chelating agents." *Id.* ¶ 50.  While not specifying any dates, the Plaintiffs generally allege that these operations "resulted in spills and releases of hazardous substances and/or hazardous wastes including, but not limited to: at least one (1) TCE spill of an unidentified quantity in the northern portion of 1551 Russell Street (at or around the former Maryland Chemical storage yard); at least two (2) PCE spills of unidentified quantities in the northern portions of 1551 and 1525 Russell Street (at or around the former Maryland Chemical loading area, paint storage area and hazardous waste storage area); and at least one (1) release of petroleum compounds containing diesel range organics ("DROs") and polycyclic aromatic hydrocarbons ("PAHs") (including, but not limited to, acenaphthene, anthracene, benzo(a)pyrene, cyrsene, dibenzo(a,h)anthracene, benzo(a)anthracene, benzo(b)fluroanthene, benzo(k)fluoranthene, fluroanthene, fluorene, phenanthene and pyrene) from an underground storage tank containing diesel fuel oil located at the southern portion of 1501 Russell Street." *Id.* ¶ 51.  A variety of environmental assessments conducted on behalf of Maryland Chemical between 1997 and 2000 allegedly identified the following contamination at the Site:

- "A plume of chlorinated VOC contamination consisting of PCE and its breakdown constituents (TCE, DCE, DCA, chloroform and vinyl chloride) . . . in the groundwater beneath 1551 Russell Street at concentrations of more than 5,800 times the applicable federal and state cleanup standards" that was migrating in a south and southeasternly direction.  *Id.* ¶¶ 52, 53 (internal quotation marks and formatting removed).

- "[P]etroleum compounds containing DROs in the groundwater beneath the southern

portion of 1501 Russell Street at concentrations which were more than 40 times the applicable federal and state cleanup standards." *Id.* ¶ 54.

Plaintiffs allege that Maryland Chemical failed to take "any action to control, mitigate, abate, remediate or remove the groundwater and soil contamination at the Russell Street Properties." *Id.* ¶ 55.  Plaintiffs further allege that these contaminants continue to migrate off-site and pollute the Waterfront Parcels and the Middle Branch.  *Id.* ¶ 56.

## V.   THE PERIOD OF THE CITY'S OWNERSHIP OF THE WATERFRONT PARCELS

After the City acquired the Waterfront Parcels, it allegedly planned to restore wetlands on those properties.  *Id.* ¶ 57.  In connection with that plan, the Maryland Department of the Environment conducted an environmental assessment of the Waterfront Parcels around October 2005.  *Id.* ¶ 59.  The assessment included groundwater and soiling sampling, which indicated that the surface and subsurface soils as well as the groundwater at the Waterfront Parcels were contaminated with various semivolatile organic compounds including PAHs, and heavy metals at "concentrations above the applicable federal and state cleanup standards and/or regulatory limits."[8]  *Id.* ¶ 60.   The assessment "concluded that incidental ingestion and dermal contact with PAH and heavy metal contaminants in the soils at the Waterfront Parcels presented an unacceptable human health risk for multiple population groups including child and, [sic] youth visitors and adult workers."  *Id.* ¶ 63.

---

[8] Specifically, Plaintiffs allege that the following pollutants were detected at or in the Waterfront Parcels: "aluminum, antimony, arsenic, chromium, lead, magnesium, manganese, silver, nickel, vanadium, zinc, 1,4-diclorobenzene, acenaptithene, anthracene, benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, flouroanthene, fluorene, idento(1,2,3-cd)pyrene, phenanthrene, pyrene and naphthalene."  Pls.' Compl. ¶ 60.

The 2005 environmental assessment, however, did not test for volatile organic compounds (such as PCE, TCE, etc.) which had previously been identified by testing at the Russell Street Properties. *Id.* ¶ 62.

Plaintiffs allege that, in response to the assessment, the Maryland Department of the Environment recommended extensive remediation at the Site.  *Id.* ¶ 64.  However, the City instead abandoned the wetland restoration project and "did not address, mitigate, abate, remediate or remove the contaminated soils from the Waterfront Parcels."  *Id.* ¶¶ 65, 66. Plaintiffs further allege that the Maryland Department of the Environment directed the City "to fully assess the nature and extent of the contamination at the Waterfront Parcels" in January 2009, but that the City refused to conduct any further assessments and simply proposed remediation activities that were somewhat less intensive than the Department had originally suggested.[9]  *Id.* ¶¶ 67, 68.

On May 5, 2010, the Department allegedly sent a letter to the City stating that the City's proposed remediation was inadequate and that there was "insufficient oil gas and groundwater sampling data to determine whether the [volatile organic compound] contamination identified . . . at the upgradient Casino Site was migrating into the [Waterfront Parcels] at levels of concern."  *Id.* ¶¶ 69, 70 (internal quotations omitted).  Again, the City allegedly took no action to control, mitigate, abate, remediate, or remove the contaminated soil or groundwater or to further assess the potential migration of volatile organic compounds.  *Id.* ¶ 71.

## VI.   THE CITY'S OWNERSHIP OF THE SITE

After acquiring the various properties constituting the Site, the City sought to enter those properties into the Maryland Voluntary Cleanup Program.  *Id.* ¶ 72.  The City

---

[9] Specifically, the Maryland Department of Environment allegedly had concluded that the top six feet of contaminated soil must be removed before the City could proceed with its wetlands restoration project.  *Id.* ¶ 64.  On February 26, 2010, the City allegedly proposed to simply remove two feet of contaminated soil at four limited areas where arsenic and PAH contamination levels were the highest.  *Id.* ¶ 68.

submitted an application for the Russell Street Properties on April 25, 2008 and for the

Warner Street Properties on June 4, 2009.  *Id.* ¶ 72.  The Voluntary Cleanup Program is

administered by the Maryland Department of the Environment and was designed to help

alleviate the problem of abandoned industrial properties that were contaminated by past

activities and uses.  The program is codified at Md. Code, Envir. § 7-503 *et seq.*  The program

allows individuals who have not contributed to contamination at a particular program-

eligible site to apply for "Inculpable Person" status.  After acquiring inculpable person

status, the individual may acquire an interest in an eligible property and will not be liable for

existing contamination at that location.  Md. Code, Envir. § 7-505(b).  However, an

inculpable person may be liable if (1) that person causes or contributes to new

contamination at the site; or (2) exacerbates existing contamination at the Site.  Md. Code,

Envir. § 7-505(c).

These applications for the Voluntary Cleanup Program allegedly contained further

environmental assessments demonstrating that "the unremediated spills and/or releases of

VOCs and petroleum compounds containing DROs and PAHs during Maryland Chemical's

past operations at the Russell Street Properties are continuing sources of contamination in

the groundwater, soil and/or soil vapor at and around the Casino Site at levels well above

applicable federal and state cleanup standards and/or regulatory limits."  *Id.* ¶ 73.

Specifically, Plaintiffs allege that the assessments reflected the following contamination:

- **Contamination at the Site**

    o   PCE and TCE concentrations 400 times the applicable federal and state

        cleanup standards in the groundwater beneath the source area of the PCE

plume at 1551 Russell Street.  *Id.* ¶ 75.

o   Volatile Organic Compound concentrations[10] as high as 3,000 times the

applicable federal and state risk-based standards in the soil vapors in and

around the source area of the PCE plume at the Russell Street Properties.  *Id.*

¶ 76.

o   Concentrations of heavy metals[11] in the surface and subsurface soils and

groundwater at the Casino Site above the applicable federal and state cleanup

standards and/or regulatory limits. *Id.* ¶ 80.

o   "Hot spots" of arsenic, cadmium, chromium, lead, mercury and silver in the

surface and subsurface soils throughout the Casino Site.  *Id.* ¶ 80.

-   **Migration of Contaminants**

o   PCE and TCE concentrations more than 100 times the applicable federal and

state cleanup standards immediately downgradient from the Russell Street

Properties to the south and southeast of the source area of the PCE plume.

*Id.* ¶ 75.

o   Volatile Organic Compound concentrations[12]  in the soil vapors immediately

downgradient from the Russell Street Properties and directly south of the

source area of the PCE plume as high as 800 times the applicable federal and

---

[10] The Complaint specifically identifies the following contaminants: PCE, TCE, TCA, chloroform, vinyl chloride, cis-1,2-dichloroethene, and trans-1,2-dichloroethene.  *Id.* ¶ 76.

[11] The Complaint specifically identifies the following contaminants: antimony, aluminum, arsenic, cadmium, chromium, lead, manganese, nickel, thallium, mercury, silver and vanadium.  *Id.* ¶ 80.

[12] The Complaint specifically identifies the following contaminants: TCE, chloroform, vinyl chloride, cis-1,2-dichloroethene hexane and pentane.  *Id.* ¶ 76.

state risk-based standards.  *Id.* ¶ 76.

o  Concentrations of Diesel Range Organics in the downgradient groundwater at more than 2,300 times the applicable federal and state cleanup standards.[13]  *Id.* ¶ 78.

o  Concentrations of certain Polycyclic Aromatic Hydrocarbons in the downgradient groundwater as high as 16,000 times the applicable federal and state risk-based standards.  *Id.* ¶ 79.

Furthermore, Plaintiffs allege that "the PCE plume at the Russell Street Properties has caused 'hot spots' . . . in the surface and subsurface soils throughout the Russell Street Properties which would render the soils to be considered 'hazardous waste', as defined under applicable federal and state hazardous waste laws, once excavated."[14]  *Id.* ¶ 77.

Plaintiffs allege that, between May 2008 and December 31, 2009, the City "allowed illegally stored and/or abandoned drums containing hazardous wastes to leak, spill and/or otherwise release into the Casino Site."  *Id.* ¶ 91.  In addition, Plaintiffs assert that the City "moved, mixed, stockpiled, backfilled and/or graded contaminated soils and groundwater at the Casino Site in order to, among other things, address abandoned pits used during previous industrial operations which contained contaminated groundwater and/or rainwater

---

[13] The Complaint also alleges that "[t]he BDC Environmental Assessments also confirmed the continued migration of PAHs (including, but not limited to, acenapthene, anthracene, benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, flouroanthene, fluorene, phenanthrene and pyrene) in the *groundwater beneath the source area* of the release of petroleum compounds containing DROs and PAHs *at the Russell Street Properties* in *the downgradient groundwater* at concentrations as high as 600 times the applicable federal and state cleanup standards."  *Id.* ¶ 78 (emphasis added). Due to the structure of this statement, this Court is unable to determine whether the specific contamination addressed by this allegation existed at the source area or at some downgradient area.

[14] Hot spots are "highly concentrated concentrations of contaminants at various depths and various locations."  *Id.* ¶ 77.

and remove at least one (1) UST located at the Russell Street Properties." *Id.* ¶ 92. These activities, according to the Complaint, occurred "in and around known hot spots of PCE, TCE and heavy metals." *Id.* ¶ 93.

## VII.   DEVELOPMENT OF THE SITE AS A CASINO BY CBAC GAMING

Around October 2012, CBAC Gaming entered into an agreement with the City to develop the Horseshoe Casino. *Id.* ¶ 181. Under the terms of those agreements, CBAC Gaming was required to participate in the Voluntary Cleanup Program and to remediate the Site. *Id.* ¶ 81. CBAC Gaming filed its Voluntary Cleanup Program application and proposed a Response Plan Amendment, which the Plaintiffs allege was less protective of the environment.[15] *Id.* ¶ 83. In particular, Plaintiffs note that CBAC Gaming's Response Action Plan did not require (1) "the excavation and removal of any of the hazardous soils, in and around the source areas of the PCE plume, including the areas of known hot spots"; (2) "construction techniques to prevent the movement of stormwater and/or surface water runoff into known hot spots and/or to control off-site migration issues into the Waterfront Parcels and the Middle Branch;" or (3) any sampling of or investigation into "whether VOCs are migrating off-site in the soil vapors above applicable federal and state cleanup standards and/or regulatory limits after construction activities are completed." *Id.* ¶¶ 84, 86. Instead, Plaintiffs claim, excavated soils have been and will continue to be "disposed of on-site by backfilling and regrading previously excavated soils and then covering the contaminated soils

---

[15] Specifically, Plaintiffs allege that the remediation measures were "limited to (1) "capping" the soil contamination at the Casino Site with standard construction materials (i.e., concrete, asphalt or landscaping) after future construction activities are completed; (2) installing a vapor mitigation system under the building proposed to be constructed on the Russell Street Properties; and (3) recording a groundwater use restriction in the land records." *Id.* ¶ 83.

with the proposed 'cap.'" *Id.* ¶ 85.

Around March 2013, CBAC Gaming began construction and remediation activities at the Site. *Id.* ¶ 94. In connection to these activities, Plaintiffs allege that "CBAC Gaming has excavated, moved, mixed, stockpiled, backfilled and/or graded contaminated soils and groundwater at the Casino Site in order to, among other things, investigate and remove at least thirteen (13) historic USTs at the Casino Site, remove existing utilities and foundations (including building footers and concrete slabs) and install new utilities and foundations at the Casino Site."[16] *Id.* ¶ 95. These activities have occurred in alleged known hot spots of PCE, TCE, and heavy metals. *Id.* ¶ 97. Despite the alleged contamination of the soil, Plaintiffs assert that CBAC Gaming has backfilled and regraded excavated soils at the Site. *Id.* ¶ 98.

Additionally, Plaintiffs allege that the planned parking garage and plantings on the Waterfront Parcels will involve the excavation, movement, and grading of known contaminated soils. *Id.* ¶¶ 99-100. The Plaintiffs note that neither the City nor CBAC Gaming has enrolled or sought enrollment of the Waterfront Parcels into the Voluntary Cleanup Program and that there are no remediation activities planned for those parcels. *Id.* ¶ 100.

## VIII.  ALLEGED HEALTH RISKS POSED BY THE CONTAMINATION AT THE SITE AND THE WATERFRONT PARCELS

Plaintiffs allege that "the VOC, PAH and heavy metal contamination in the soils and groundwater at the Casino Site, which have migrated and will continue to migrate in the soils, soil vapors and/or groundwater off-site and into the surrounding areas, including the

---

[16] More specifically, Plaintiffs allege that "CBAC Gaming's construction activities have and/or will involve the excavation of subsurface soils as deep as 60 feet beneath the surface of the Casino Site in order to install foundation pilings for proposed structures and buildings." *Id.* ¶ 96.

Waterfront Parcels and the Middle Branch, presents a[n] imminent and substantial risk to human health and the environment." *Id.* ¶ 102. In particular, Plaintiffs allege that the presence of volatile organic compounds presents an imminent and substantial risk to the health of workers and visitors in the areas and buildings around the Russell Street Properties. *Id.* ¶ 103. According to the Complaint, the "human health effects associated with breathing small amounts of VOCs include headaches, nausea, lung irritation, dizziness, confusion, poor coordination, and difficulties with speaking, walking, and concentrating," while longer exposure can cause "nerve, kidney and liver damage, impaired heart function, unconsciousness and death." *Id.* ¶ 104. Meanwhile, Plaintiffs also allege that "[l]ong terms [sic] exposure to TCE, vinyl chloride, and 1,2-dichloroethene, which are known or probable human carcinogens, may also cause cancer." *Id.* ¶ 105.

Plaintiffs also allege that more recent testing conducted in April 2013 indicates that the Waterfront Parcels are still polluted at unsafe levels. Specifically, Plaintiffs allege that sampling conducted "along the shoreline of the Middle Branch and immediately downgradient from the Waterfront Parcels" revealed that "the soils and groundwater in the channel ward of the Waterfront Parcels are contaminated with the same PAHs, DROs and heavy metals which have been identified as sources of contamination at and under the Casino Site."[17] *Id.* ¶ 107. The concentrations of PAHs and heavy metals exceeded federal and state cleanup standards by "more than 1,000 times" and federal and state risk-based standards by "more than 12,000 times." *Id.* ¶ 108 (emphasis removed). The highest

---

[17] The contaminants include acenaphthene, anthracene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, fluoranthene, fluorene, phenanthrene, pyrene, aluminum, antimony, arsenic, cadmium, chromium, lead, manganese, mercury, nickel and silver. *Id.* ¶ 107.

concentrations "were detected immediately downgradient from the source area of the release of petroleum compounds." *Id.* ¶ 109.

The Complaint also explains the human health risks associated with PAH contamination:

> The health effects associated with short-term exposure to PAHs via incidental skin contact and/or ingestion include nausea, vomiting, diarrhea, confusion and skin irritation (e.g., redness, inflammation, blistering, and peeling). . . . PAHs can be absorbed through the skin and therefore, long-term health effects can also include cataracts, organ (e.g., lung, liver and kidney) damage and cancer.

*Id.* ¶¶ 114-15.  Plaintiffs also expressly note the dangers of PAH contamination to aquatic invertebrates that live in aquatic sediments, which is where such contamination generally concentrates.  *Id.* ¶ 110.  According to the Complaint, PAH contamination can cause "inhibited reproduction, delayed emergence, sediment avoidance, liver neoplasms and other abnormalities and mortalities" in such creatures.  *Id.* ¶ 111.  Meanwhile, "[h]eavy metals bioaccumulate in muscle tissue and therefore heavy metal contamination in the aquatic environment can cause various adverse health effects to the aquatic ecosystem and to humans through fish consumption." *Id.* ¶ 112.

## IX.    THE PENDING LAWSUIT

The Plaintiffs filed this suit on or about September 19, 2013, asserting two counts under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.*  Count I asserts a claim under § 6972(a)(1)(A) against the City, CBAC Gaming, and CBAC Borrower.  Count II asserts a claim under § 6972(a)(1)(B) against Maryland Chemical, the City, CBAC Gaming, and CBAC Borrower.  In redress of their claims, Plaintiffs request this Court to:

a) Declare that the Casino Site constitutes an unpermitted hazardous waste, treatment, storage or disposal facility and that Defendants Baltimore City, CBAC Gaming and CBAC Borrower are in violation of applicable federal and state hazardous waste laws and regulations;

b) Declare that the past and present acts and/or omissions of Defendants Maryland Chemical, Baltimore City, BDC, CBAC Gaming and CBAC Borrower have caused and/or contributed to then imminent and substantial endangerment to human health and/or the environment which is present at the Casino Site and the Waterfront Parcels;

c) Order and enjoin Defendants Baltimore City, CBAC Gaming and CBAC Borrower to comply with applicable federal and state hazardous waste laws and regulations which have been violated and to refrain from taking any further activities at the Casino Site or the Waterfront Parcels until Defendants correct and/or remedy any and all violations and obtain any and all necessary permits and approvals;

d) Order and enjoin Defendants Maryland Chemical, Baltimore City, BDC, CBAC Gaming and CBAC Borrower to conduct a comprehensive environmental investigation and assessment at the Casino Site and the Waterfront Parcels to determine the nature and extent of contamination which is migrating off-site, including into the Waterfront Parcels and the Middle Branch, and to determine to the nature and scope of the endangerment to human health and/or the environment which is presented by the contamination at and around the Casino Site and the Waterfront Parcels;

e) Order and enjoin Defendants Maryland Chemical, Baltimore City, BDC, CBAC Gaming, and CBAC Borrower to take any and all remedial measures necessary to control, abate, prevent or mitigate the ongoing migration of contamination from the Casino Site, including into the Waterfront Parcels and the Middle Branch, in the soils, soil vapors and/or groundwater and/or the imminent and substantial endangerment to human health and/or the environment which is present at and around the Casino Site and the Waterfront Parcels to levels which are protective of human health and the environment;

f) Order and enjoin Defendants Maryland Chemical, Baltimore City, BDC, CBAC Gaming and CBAC Borrower to take any and all remedial measures necessary to remedy all contamination which has contributed to and is contributing to the contamination of the Waterfront Parcels and the Middle Branch;

17

g)      Civil penalties as authorized by § 7002(a) of RCRA, 42 U.S.C. 6972(a); [and]

h)      Award Plaintiffs its reasonable litigation costs, including attorney's fees and experts fees.

*Id.* ¶ a-h.  On October 15, 2013, the Defendants filed a number of motions to dismiss. Defendants CBAC Borrower and CBAC Gaming filed a Motion to Dismiss (ECF No. 11) pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Defendant Maryland Chemical filed its own Motion to Dismiss (ECF No. 13) for failure to state a claim pursuant to Rule 12(b)(6).  Finally, Defendants Baltimore Development Corp. and Baltimore City filed a Motion to Dismiss (ECF No. 15) pursuant to Rules 12(b)(1) and 12(b)(6).  After the motions were fully briefed, Plaintiff filed a Motion for Leave to File Sur-Reply (ECF No. 33) with respect to the CBAC Defendants' Motion.

STANDARD OF REVIEW

### I.      Rule 12(b)(1)

When a defendant moves to dismiss a plaintiff's claim for lack of standing, courts commonly address the motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See Payne v. Chapel Hill North Properties, LLC*, 947 F. Supp. 2d 567 (M.D.N.C. 2013) ("Generally, challenges to standing are addressed under Rule 12(b)(1) for lack of subject matter jurisdiction."); *see also Nat'l Alliance for Accessibility, Inc. v. Rite Aid of N. Carolina, Inc.*, 1:10CV932, 2011 WL 4499294 (M.D.N.C. Sept. 27, 2011) ("Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may assert that a court lacks subject matter jurisdiction over a plaintiff's complaint, including by challenging a plaintiff's standing."); *Food & Water Watch v. United States Envtl. Prot. Agency*, CV 12-1639(RC), 2013 WL 6513826, at *5 (D.D.C. Dec. 13, 2013) ("[A] motion to dismiss for lack of standing constitutes a motion under Rule

12(b)(1) of the Federal Rules of Civil Procedure because the defect of standing is a defect in subject matter jurisdiction." (internal quotation marks omitted)).

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint. *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). This challenge under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted). With respect to a facial challenge, a court will grant a motion to dismiss for lack of subject matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction." *Davis*, 367 F. Supp. 2d at 799. When addressing such a facial challenge, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Where the challenge is factual, the district court may look beyond the pleadings and "decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see also Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003) ("[T]he court may look beyond the pleadings and 'the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'"). A plaintiff carries the burden of establishing subject matter jurisdiction. *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999).

## II.      Rule 12(b)(6)

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P 8(a)(2).   Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted.   The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court's recent opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).   The Supreme Court's decision in *Twombly* articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss.  *Iqbal*, 556 U.S. at 678.   First, while a court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference.  *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)).

Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679. Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Although the plausibility requirement does not impose a "probability requirement," *id.* at 556, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) ("A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim. It need only *allege facts* sufficient to *state* elements of the claim." (emphasis in original) (internal quotation marks and citation omitted)). In making this assessment, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Iqbal*, 556 U.S. at 679. "At bottom, a plaintiff must nudge [its] claims across the line from conceivable to plausible to resist dismissal." *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (internal quotation marks omitted).

ANALYSIS

## I.   STANDING

Under Article III of the United States Constitution, federal courts may only adjudicate "actual cases and controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984). The doctrine of standing is designed to give effect to this requirement by "ensur[ing] that a plaintiff has a sufficient personal stake in a dispute to render judicial resolution appropriate." *Piney Run Preservation Ass'n v. Cnty. Com'rs of Carroll Cnty., Md.*, 268 F.3d 255, 262 (4th Cir.

2001) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153 (4th Cir. 2000)).  In order to establish standing to sue, the plaintiff must demonstrate three basic elements: (1) the plaintiff must have suffered an "injury in fact," (2) the injury must be caused by or "fairly traceable" to the defendant's challenged conduct, and (3) it must be likely that the plaintiff's injury would be redressed by the requested relief.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  When assessing standing before a federal court, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

In this case, the City argues that the Plaintiffs' allegations are inadequate to establish this Court's jurisdiction.  As such, the City's Motion raises a facial challenge, and this Court will determine whether the allegations in the Complaint, when taken as true, are sufficient to establish standing under the plausibility standard of Rule 12(b)(6) and *Iqbal/Twombly.  See Davis*, 367 F. Supp. 2d at 799; *Zander v. U.S.*, 786 F. Supp. 2d 880, 883 (D. Md. 2011) (applying *Iqbal/Twombly* standard to motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)); *see also Kerns*, 585 F.3d at 192.

The City's main challenge to Plaintiffs' standing arises under the injury in fact prong; specifically, the City contends that the Plaintiffs have failed to adequately allege injury in fact "because they allege only general interests in the Waterfront Parcels, the Gwynns Falls Trail, and the Middle Branch."  Def. City's Mem. Supp. Mot. Dismiss 21, ECF No. 15-1.  Additionally, the City argues that Plaintiffs have failed "to explain how the City's alleged RCRA violations at the Casino Site impact the Waterfront Parcels, the Gwynns Falls Trail, and the Middle Branch or lessen the Plaintiffs' use of . . . [those areas]," Def. City's Mem.

Supp. Mot. Dismiss 23—an allegation that this Court interprets as an attack relating to the causation requirement.[18]

## A. Injury in Fact

Under the established injury in fact requirements in environmental cases, Plaintiffs need not "show environmental harm"; rather, they must allege "a direct nexus" between themselves and the "area of environmental impairment." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 394-95 (4th Cir. 2011). Specifically, they must allege that they "use the affected area" (rather than an area "roughly in the vicinity") and "are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id.* at 397 (internal quotation marks omitted); *see also EarthReports, Inc. v. U.S. Army Corps of Engineers*, No. 8:10-cv-1834-AW, 2011 WL 4480105, at *4 (D. Md. Sept. 26, 2011) ("To establish an imminent threatened or future injury to his/her use of an area, a plaintiff must assert concrete plans to use the area rather than a vague, 'some day' desire to use the area.").

The City asserts that the Plaintiffs have failed to adequately allege injury in fact. The City characterizes the Plaintiffs' allegations as "speculative conclusions" concerning mere "general interests." *See* Def. City's Mem. Supp. Mot. Dismiss 21-22.

The Complaint details the various uses of several specific Plaintiffs. Plaintiff Bruce Goldfarb, "an avid photographer" and cyclist, bikes along the portions of the Gwynns Falls Trail on the Waterfront Parcels and takes pictures of the flaura and fauna. *See* Pls.' Compl. ¶ 12. Plaintiff Michael Gallagher walks along the portion of the Trail on the Waterfront

---

[18] No issue has been raised as to the third element of redressability.

Parcels for exercise and to reach downtown Baltimore from his home in the Westport neighborhood. *See id.* ¶ 15. Plaintiff Tim Bull fishes in the Middle Branch area near the Site "approximately every five (5) months," but has avoided teaching his son to fish in the area due to the alleged contamination. *See id.* ¶17. All three—Goldfarb, Gallagher, and Bull—allege that they are concerned about the contamination at the Site and that their specific usages of the areas surrounding the Site would increase if the contamination were remedied. Accordingly, with respect to Plaintiffs Bruce Goldfarb, Michael Gallagher, and Tim Bull, the Complaint alleges sufficient nexus due to the alleged diminished aesthetic and recreational value of the area to these Plaintiffs.[19] Therefore, these Plaintiffs have standing to assert their claims.

With respect to Plaintiffs Ruth Sherrill, Sherry Moore-Edmonds, Merab Rice, Elizabeth Arnold, and Julia Dinkins, the analysis is somewhat different. All five live in surrounding areas relative to the Site.[20] According to the Complaint, Sherrill "enjoys the greenery and water views in and around the Gwynns Falls Trail." *Id.* ¶ 19. Moore-Edmonds "has used the portion of the Trail along the Waterfront Parcels and the open space area in and around its vicinity for recreation purposes." *Id.* ¶ 20. Meanwhile, "Rice's children frequently use and recreate along the Gwynns Falls Trail." *Id.* ¶ 21. Neither Arnold nor Dinkins alleges any specific usage of the area in the immediate vicinity of the Site. *See id.* ¶¶ 22, 23. All five of these Plaintiffs profess that they are concerned about the contamination

---

[19] The City's brief cites to *Covington v. Jefferson Cnty.*, 358 F.3d 626 (9th Cir. 2004). In a parenthetical, the City includes the following quotation: "[H]arms occasioned by RCRA violations in context are sufficient to satisfy the injury in fact requirement." The City does not provide any other explanation for the case's relevance to this matter.

[20] Specifically, Plaintiffs are residents of the Westport and Cherry Hill neighborhoods.

at the Site.[21]  *Id.* ¶¶ 19-23.  If the area were remediated, Sherrill alleges that she would "use and enjoy the area in the future," while the others assert that they would "feel safer" recreating in the area and would "derive greater enjoyment" from such use.  *Id.* ¶¶ 19-23.

Just as in *Richardson v. Mayor and City Council of Baltimore*, Civ. A. No. RDB-13-1924, 2014 WL 60211 (D. Md. Jan. 7, 2014)—another case before this Court relating to the Casino Site—Plaintiffs have failed to allege either the nature or type of their planned use. Moreover, with the exception Moore-Edmonds, Plaintiffs have merely alleged that they use or recreate on the "Gwynns Falls Trail" but make no mention of the specific portion of the Trail running through the Waterfront Parcels.  This general statement fails to allege any nexus with the affected area itself rather than an area that is simply in the general vicinity of the Site.  *See Richardson*, 2014 WL 60211, at *4.  Therefore, Plaintiffs Ruth Sherrill, Sherry Moore-Edmonds, Merab Rice, Elizabeth Arnold, and Julia Dinkins have failed to adequately allege facts to support their standing to sue and, accordingly, their claims are dismissed.

### B.  Causation

With respect to the remaining Plaintiffs Goldfarb, Gallagher, and Bull, the City obliquely references the causation prong, arguing that Plaintiffs have failed "to explain how the City's alleged RCRA violations at the Casino Site impact the Waterfront Parcels, the Gwynns Falls Trail, and the Middle Branch or lessen the Plaintiffs' use of . . . [those areas]." Def. City's Mem. Supp. Mot. Dismiss 23.  However, the Complaint alleges that the City "moved, mixed, stockpiled, backfilled and/or graded contaminated soils and groundwater at the Casino Site."  *Id.* ¶ 92.  In addition, Plaintiffs allege that the City failed to control or

---

[21] Additionally, Rice is concerned about the health risks posed to her children.  *Id.* ¶ 21.

remediate known contamination at the Site or prevent the migration of the contamination to the Waterfront Parcels.  *See id.* ¶ 71.  These activities have allegedly "contribute[d] to and/or exacerbate[d] the contamination in the soils and groundwater at the Casino Site and the Waterfront Parcels."  *Id.* ¶ 101.  Finally, Plaintiffs allege that many of the contaminants at the Site migrate into the Middle Branch on an ongoing basis.  *See, e.g., id.* ¶ 87.  Regardless of whether Plaintiffs' allegations are sufficient to state a claim under RCRA, the allegations summarized above are sufficient to establish the causation or traceability required to establish standing for these three Plaintiffs.

## II.   <u>NOTICE</u>

Although RCRA provides for suits by private citizens, the Plaintiffs Goldfarb, Gallagher and Bull must comply with the notice requirements of the statute.  Under both § 6972(a)(1)(A) and § 6972(a)(1)(B), plaintiffs must provide notice to the EPA Administrator, the relevant state, and the allege violator and then wait a specified period before commencing suit.  *See* § 6972(b)(1)(A) (requiring sixty (60) days notice for actions under § 6972(a)(1)(A)); § 6972(b)(2)(A) (requiring ninety (90) days notice for actions under § 6972(a)(1)(B)).  However, a plaintiff may bring an action immediately after giving notice if the action involves a "violation of subchapter III"—i.e., a violation involving hazardous waste management.  The prescribed content of the notice is laid out in 40 C.F.R. § 254.3:

> Notice regarding an alleged violation of a permit, standard, regulation, condition, requirement, or order which has become effective under this Act shall include sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date

> or dates of the violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 254.3(a).  The regulation also requires the notice to "state the name, address, and telephone number of the legal counsel, if any, representing the person giving the notice." *Id.* § 254.3(c).

Under current United States Supreme Court precedent, the notice requirements of the statute are to be strictly construed.  *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 26 (1989).  In fact, if a plaintiff fails to satisfy the notice requirements, a district court is without subject matter jurisdiction to hear the case.  *See Blumenthal Power Co. v. Browning-Ferris, Inc.*, No. 94CV2612, 1995 WL 1902124, at * 4 (D. Md. Apr. 19, 1995).  In this case, Defendants have challenged both the timing and content of Plaintiffs' notice.

## A.  Timing of Plaintiffs' Notice

Plaintiff Bull originally sent notice to CBAC Gaming, Maryland Chemical, the City, Daniel China (General Counsel for Whiting Turner), and officials at the EPA and the Maryland Department of the Environment on May 3, 2013.[22]  On September 13, 2013, Plaintiffs sent another letter "to supplement and/or amend the parties, allegations and claims contained in the May Notice Letter."  Def. CBAC's Mem. Supp. Mot. Dismiss Ex. 4 (hereinafter "Sept. NOI Letter"), ECF No. 11-6.  Specifically, the September Letter added Plaintiffs Michael Gallagher and Bruce Goldfarb as well as Defendants CBAC Borrower and Baltimore Development Corp., and stated that Plaintiffs were giving notice of their intention

---

[22] Plaintiffs Ruth Sherrill, Elizabeth Arnold, Merab Rice, Sherry Moore-Edmonds, and Julia Dinkins also provided notice of their claims on May 3, 2013.  However, this Court has already dismissed these Plaintiffs from this case for lack of standing.

to sue "immediately after all of the [recipients] received notice." *Id.* at 2. Plaintiffs filed this lawsuit on September 19, 2013—just six days after sending their September notice letter.

The City contends that Plaintiffs Goldfarb and Gallagher are not properly before the Court because they filed suit less than sixty days after first providing notice of their claim. *See* City's Mem. Supp. Mot. Dismiss 20 n.15. Plaintiffs' Notice, however, clearly states that Plaintiffs' claims pertained to "hazardous waste violations." [23]   Sept. NOI Letter 2. Accordingly, provided Plaintiffs have made a credible allegation of a Subchapter III violation, the timing of Plaintiffs' filing was permissible. *See Blumenthal Power Company v. Browning-Ferris, Inc.*, Civ. A. No. 94CV2612, 1995 WL 1902124, at *5 (D. Md. April 19, 1995) ("[A] plaintiff must make a credible allegation of a Subchapter III violation in order to escape the delay requirement. By 'credible,' the Court means one that is at least facially applicable to the facts of the case."). In light of the fact that many of the contaminants identified in the Notice Letter are regulated under the federal and state hazardous waste regulations, Plaintiffs have satisfied the timing requirements and permissibly filed this action without any further delay.

## B. Content of Plaintiffs' Notice

Both the CBAC Defendants and the City assert that the content of Plaintiffs' Notice is deficient. The CBAC Defendants argue that, although the "Notices state that Plaintiffs intend to sue Defendants under § 6972(b)(1)(A)," they have only referenced "general

---

[23] Specifically, Plaintiffs' Notice Letter alleges that Defendants violated 40 C.F.R. § 262.11 and COMAR 26.13.03.02; 40 C.F.R. § 262.20 through 262.44, Md. Code, Envir. § 7-224, and COMAR 26.13.03.02 through 26.13.03.06; Md. Code, Envir. § 7-232 and COMAR 26.13.07.01A; and COMAR 26.13.05.01 through 26.13.05.05. Notably, 40 C.F.R. Part 262 is titled "Standards Applicable to Generators of Hazardous Waste," while the COMAR provisions identified by Plaintiffs are part of the "Disposal of Controlled Hazardous Substances" subtitle.

provisions of RCRA, rather than specific references to how CBAC Gaming has violated RCRA." Def. CBAC's Mem. Supp. Mot. Dismiss 16.  Additionally, the CBAC Defendants argue that the Notice fails to identify "the specific hazardous waste being treated, stored and/or disposed of as well as the dates of any alleged violation." *Id.* Meanwhile, the City contends that:

> Both notices state that Plaintiffs intend to sue the City under Section 6972(b)(1)(A) but cite only to general provisions of RCRA, rather than specific references as to how the City has violated RCRA.  Simply stating that the City's alleged prior activities at the Russell Street and Warner Street Properties converted the site into an unpermitted treatment, storage, and disposal facility and citing generally to contamination that exceeds "applicable" standards is not adequate notice.  Plaintiffs have failed to inform the City as to the specific hazardous waste being treated, stored and/or disposed of as well as the dates of any alleged violation.

Def. City's Mem. Supp. Mot. Dismiss 19.

As discussed above, federal law requires the notice to include (1) the permit, regulation, or requirement allegedly violated, (2) the alleged illegal activity, (3) the alleged responsible individual, (4) the date(s) of the violation, (5) the name, address, and telephone number of the plaintiff, and (6) the name, address, and telephone number of plaintiff's counsel.  40 C.F.R. § 254.3.  Turning to Plaintiffs' September 2013 Notice, it is clear that Plaintiffs Goldfarb, Gallagher, and Bull have satisfied their duties.  The September Notice identifies a number of substantive hazardous waste regulations in the Code of Federal Regulations and the Code of Maryland Regulations.  *See* September NOI 14-16; *see also supra* note 23.  The Notice also identifies the City and the CBAC Defendants as those entities responsible for the violations, and it states that the "excavating, stockpiling, grading and/or

backfilling contaminated soils and groundwater" caused the spread of a number of expressly identified contaminants at the Site.[24]   *See id.*   In addition, the Notice includes the required contact information for Plaintiffs and their counsel.  Plaintiffs' Notice is also sufficient as to the dates of the alleged violations.  With respect to the City, the Notice states that the alleged violations occurred between March 1, 2009, and August 31, 2009; with respect to the CBAC Defendants, the Notice states that the violations occurred between "March 1, 2013, through the present."  Sept. NOI 14-16.   Although the City protests that the range of dates is inadequate, "[i]n this circuit, it is sufficient to allege ongoing violations relating to the pollutant discharges identified in a notice letter."   *Potomac Riverkeeper, Inc. v. Marcella M. Klinger, LLC*, Civ. A. No. JKB-13-801, 2013 WL 5505397, *5 (D. Md. Oct. 1, 2013) (citing *Gaston Copper*, 629 F.3d at 401); *cf. Bd. Of Cnty. Com'rs of Cnty. of La Plata, Co. v. Brown Group Retail, Inc.*, 598 F. Supp. 2d 1185, 1197 (D. Co. 2009) ("Although the notice letter does not state any particular date of the violation, the letter does limit the span of the alleged violation to a time period beginning on November 19, 1980, and ending on the unspecified date in 1983 when Plaintiff purchased the property from Brown Group. This is sufficient to meet the fourth prong of the notice inquiry.").   Accordingly, this Court finds that Plaintiffs' Notice Letter contained all the necessary elements.

---

[24] Notably, the Notice also provided further details on the alleged activities of the City and the CBAC Defendants on pages 8-9 and 11-12.  The contaminants identified by the Notice include "PCE, TCE, DCE, DCA, vinyl chrloride [sic], chloroform, acenapthalene, anthrancene, benzo(a)pyrene, crysene, dibenzo(a,h)antrhacene, benzo(a)anthracene, benzo(k)fluoranthene, benzo(b)fluranthene, fluroanthene, fluorine, phenantrene, pyrene, naphthalene, arsenic, cadmium, chromium, lead, manganese, magnesium, mercury, silver, thallium and vanadium."  *See* Sept. NOI 14.

### III.   **PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY**

Before turning to the merits of the Defendants' arguments with respect to liability

under the Resource Conservation and Recovery Act, this Court addresses Plaintiffs' Motion

for Leave to File Sur-Reply (ECF No. 33).   As this Court has previously indicated, sur-

replies are not usually part of this Court's usual briefing schedule:

> In general, parties are not permitted to file sur-replies. Local
> Rule 105.2(a) (D.Md. 2011). A party moving for leave to file a
> surreply must show a need for a surreply. *Id.* If a defendant
> raises new legal issues or new theories in its reply brief, there is
> a basis to permit a plaintiff to file a surreply. *TECH USA, Inc. v.*
> *Evans,* 592 F. Supp. 2d 852, 862 (D. Md. 2009); *Interphase*
> *Garment Solutions, LLC v. Fox Television Stations, Inc.,* 566 F. Supp.
> 2d 460, 466 (D. Md. 2008). Moreover, "[s]urreplies may be
> permitted when the moving party would be unable to contest
> matters presented to the court for the first time in the opposing
> party's reply." *See Khoury v. Meserve,* 268 F. Supp. 2d 600, 605 (D.
> Md. 2003).

*MTB Servs., Inc. v. Tuckman-Barbee Const. Co.*, Civ. A. No. RDB-12-02109, 2013 WL 1224484

(D. Md. Mar. 26, 2013).

Here, Plaintiffs contend that the Defendants raised three new arguments and/or

theories regarding the interplay between the Maryland Voluntary Cleanup Program, the

federal Resource Conservation and Recovery Act, and the discharge permit issued under the

Clean Water Act.[25]  The Defendants oppose any further briefing on the issue, asserting that

---

[25] Specifically, Plaintiffs assert that the CBAC Defendants asserted the following new arguments:
> First, CBAC Defendants argued for first time that their Response Action Plan ("RAP"),
> approved under the Maryland Voluntary Cleanup Program ("VCP"), was "incorporated
> into" their NDPES General Stormwater Permit and, as such, all of their "cleanup activities"
> at the Casino Site were regulated under the terms of their NPDES General Stormwater
> Permit. Second, CBAC Defendants argued for the first time that under Maryland law, VCP
> participants are exempt from RCRA's "permitting authority" and are instead regulated "by
> use of" a NPDES General Stormwater Permit under the CWA. Third, CBAC Defendants
> cited the industrial wastewater discharge exclusion under RCRA's solid waste definition, at,

their arguments were properly raised in their original Memorandum in Support of their motion and that their Reply brief simply rebutted the arguments made in the Plaintiffs' response.

The CBAC Defendants did in fact include some argument as to the effect of the non-duplication provision of RCRA in their opening brief.  *See* Def. CBAC's Mem. Supp. Mot. Dismiss 13-15 (including section titled "Counts I and II should be Dismissed Pursuant to Rules 12(b)(1) & 12(b)(6) Because CBAC Gaming's NPDES Permit Shields CBAC from Liability Under RCRA").  Nevertheless, this Court finds that the CBAC Defendants' Reply brief articulates new, alternative theories that were not fully developed in its opening brief. Moreover, the Proposed Sur-Reply provides argument and discussion that is relevant and will aid the Court in reaching a decision.  *See Minter v. Wells Fargo Bank, N.A.*, 283 F.R.D. 268, 270 n.3 (D. Md. 2012) ("The Court finds, however, that the filing of a surreply is warranted because it addresses evidence raised for the first time in the reply. The surreply provides context for this evidence that will aid the Court in reaching a just decision. As such, the Court will grant the motion for leave to file a surreply.").  Accordingly, this Court will grant Plaintiffs' Motion for Leave to File Sur-Reply.

## IV.   <u>LIABILITY UNDER THE RESOURCE CONSERVATION AND RECOVERY ACT ("RCRA")</u>

The Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, ("RCRA") is a comprehensive regulatory scheme designed to govern the treatment, disposal, and storage of solid and hazardous wastes from their creation to their destruction or ultimate disposal.

---

42 U.S.C. § 6903(27), in support of their claimed exemption from RCRA's coverage. CBAC Defs.' Reply 4-5, 7-8, 10-11.
Pls.' Mot. File Sur-Reply 2-3, ECF No. 33.

Plaintiffs contend that the Defendants' activities at the Site subject them to liability under the Act.  Defendants dispute their liability and proffer several different arguments in support of their position.  First, the CBAC Defendants assert that their stormwater discharge permit shields them from any RCRA liability.  Second, all Defendants argue that Plaintiffs have failed to allege plausible claims against them.

## A.  Effect of CBAC's National Pollutant Discharge Elimination System Permit

The CBAC Defendants contend that the Site's stormwater discharge permit shields them from any RCRA liability.  Specifically, the CBAC Defendants contend the Site has been included under the Maryland Department of the Environment General Permit for Stormwater Associated with Construction Activity ("Maryland General Construction Stormwater Permit" or "the Permit"), a general National Pollutant Discharge Elimination System (a "NPDES permit") industrial discharge permit.[26]  In the Defendants' view, this Permit authorizes "the very *activities* that CBAC is conducting at the Site" because the Permit and various other approved plans relating to the work at the Site require compliance with the Response Action Plan.[27]  Def. CBAC's Reply 11.  Because of this incorporation into the NPDES permit, Defendants assert that RCRA's anti-duplication provision, 42 U.S.C. § 6905, bars any further liability to Plaintiffs.

---

[26] Maryland oversees the issuance of National Pollutant Discharge Elimination System permits on behalf of the federal government.

[27] Specifically, Defendants contend that the Maryland General Construction Stormwater Permit "expressly incorporates the obligation to follow Maryland erosion and sediment control and stormwater management laws and regulations and to comply with approved erosion and sediment control and stormwater management plans." *See* Def. CBAC's Reply 8.  The CBAC Defendants argue that because the erosion and sediment control and stormwater management plan required compliance with the Response Action Plan, the permit therefore incorporated the measures contained in the Response Action Plan.

In their Sur-Reply, Plaintiffs present several different arguments in an attempt to thwart Defendants' reliance upon the NPDES permit, the CBAC Defendants' inculpable person status,[28] and the Site's inclusion in the Voluntary Cleanup Program.  Plaintiffs first argue that the Response Action Plan imposes no regulatory obligations upon the CBAC Defendants because the Plan was formulated as part of a voluntary remediation program.  Additionally, Plaintiffs assert that the Response Action Plan is not incorporated into the NPDES stormwater discharge permit because the Clean Water Act and the Resource Conservation and Recovery Act create wholly different regulatory regimes.  Alternatively, Plaintiffs argue that, even if the Response Action Plan is incorporated into the NPDES permit, there is no inconsistency necessitating the application of RCRA's anti-duplication provision.  Plaintiffs assert that the Clean Water Act regulates *discharges* from point sources; accordingly, Plaintiffs argue that the anti-duplication provision would only shield the CBAC Defendants from liability for discharges into the Middle Branch, and not for the actual movement of the contaminated soils and groundwater on and around the Site itself.

The anti-duplication provision of the Resource Conservation and Recovery Act provides that "nothing in [this Act] shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the Federal Water Pollution Control Act (33 U.S.C. § 1251 *et seq.*) . . . except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts."  42 U.S.C. § 6905(a).  In cases where this provision is applicable, "Defendants have the burden

---

[28] The CBAC Defendants were granted "Inculpable Person" status under the Maryland Voluntary Cleanup Program; as a result, the CBAC Defendants were no longer liable for existing contamination at the Site provided they complied with the approved Response Action Plan, which required a number of remediation activities.  *See* Pls.' Compl. ¶ 83; *see also* Def. CBAC's Reply 5-7.

'to show that . . . an inconsistency would result.'" *Raritan Baykeeper, Inc. v. NL Industries, Inc.*, Civ. A. No. 09-cv-4117, 2013 WL 103880, at *27 (D.N.J. Jan. 8, 2013) (quoting *Legal Environmental Assistance Foundation, Inc. v. Hodel*, 586 F. Supp. 1163, 1167 (E.D. Tenn. 1984)).

Meanwhile, the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*— commonly known as the Clean Water Act—regulates the discharge of pollutants from point sources into the navigable waters of the United States.  Of note in this case is the permit requirement for stormwater discharges "associated with industrial activity."  40 C.F.R. § 122.26(a)(1)(ii); *see also* 40 C.F.R. § 122.26(b)(14)(x) (defining "storm water discharge associated with industrial activity" and identifying "industrial activity" as, *inter alia*, "[c]onstruction activity including clearing, grading and excavation, except operations that result in the disturbance of less than five acres of total land area"); *id.* § 122.26(b)(15)(i) (defining "storm water discharge associated with small construction activity" as, *inter alia*, storm water discharge from "[c]onstruction activities including clearing, grading, and excavating that result in land disturbance of equal to or greater than one acre and less than five acres.").[29]  Federal law requires an analogous or more stringent regulatory requirement in those States authorized to administer their own permitting programs.  *See* 40 C.F.R. § 123.25(a)(9).  Maryland has obtained such approval and, rather than requiring individual

---

[29] Moreover, RCRA excludes material discharged pursuant to an industrial discharge permit from its definition of solid waste.  *See* 42 U.S.C. § 6903(27) ("The term 'solid waste' means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include . . . solid or dissolved materials . . . industrial discharges which are point sources subject to permits under section 1342 of Title 33.").

Under Maryland law, the definition is similar: "Industrial wastewater discharges that are point source discharges permitted pursuant to §402 of the Clean Water Act, as amended, or permitted pursuant to Environment Article, §§9-324-9-332, Annotated Code of Maryland" "are not solid wastes for the purpose of [the Identification and Listing of Hazardous Waste chapter]."  COMAR 26.13.02.04A(2).

permits for each construction site, has opted to issue a general permit which covers "new and existing storm water discharges that are composed in whole or in part of discharges associated with construction activity." [30]   *See* COMAR 26.08.04.09A(4).   Notably, the Maryland permitting regulations state that permittees "shall comply with requirements to obtain approval for (a) erosion and sediment control plans required under Environment Article, Title 4, Subtitle 1, Annotated Code of Maryland; and (b) Storm water management plans required under Environment Article, Title 4, Subtitle 2, Annotated Code of Maryland." COMAR 26.08.04.09A(5).

Turning to the facts of this case, this Court recognizes that the Maryland Voluntary Cleanup Program is—as its name implies—a voluntary program imposing no legal requirements of its own.   Nevertheless, this Court cannot simply ignore the language of the NPDES permit applicable in this case.   NPDES permits are interpreted in the same manner as contracts and, "if the language is plain and capable of legal construction, the language alone must determine the permit's meaning."   *Piney Run Preservation Ass'n v. County Com'rs of Carroll Cnty., MD*, 268 F.3d 255, 269-70 (4th Cir. 2001) (internal quotation marks omitted). Notably, the Maryland General Construction Stormwater Permit[31] states that:

> Persons who obtain coverage under this general permit shall, prior to commencing construction, develop and obtain approval

---

[30] The regulation defines construction activity in light of "the Federal Act and Environment Article, Title 4, Subtitles 1 and 2, Annotated Code of Maryland."  COMAR 26.08.04.09A(4).  The term "Federal Act" is defined as "the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), its amendments, and all regulations and rules adopted under the Act."  COMAR 26.08.01.01B(33).

[31] The CBAC Defendants obtained coverage under the Maryland General Construction Stormwater Permit by filing a Notice of Intent to be covered by the Maryland Department of the Environment General Permit for Stormwater Associated with Construction Activity, which the Maryland Department of the Environment granted.  Specifically, the Department originally approved coverage under the permit on February 12, 2013, and additional activities were approved on May 1, 2013.

> from appropriate approval authority of: (i) erosion and sediment control plans in accordance with the requirements established in Title 4, Subtitle of the Environment Article, Annotated Code of Maryland (Sediment Control); and in Code of Maryland Regulations (COMAR) 26.16.01 (Erosion and Sediment Control); and (ii) stormwater management plans in accordance with the requirements established in Title 4, Subtitle 2 of the Environment Article, Annotated Code of Maryland (Stormwater Management); and in COMAR 26.17.02 (Stormwater Management).

Def. CBAC's Mem. Supp. Mot. Dismiss Ex. 17, Part II.A.3.  Moreover, the Permit requires the implementation of control measures sufficient "to meet applicable water quality standards" and notes that "stormwater controls developed, implemented, and updated consistent with the laws and regulations cited in Part II.A."—i.e., the sediment control and stormwater management provisions cited above—are generally considered sufficient to meet "applicable water quality standards." *Id.* at Part IV.A.1.  Most importantly, the Permit requires the CBAC Defendants to "comply with erosion and sediment control and stormwater management plans approved in accordance with the laws and regulations cited in Part II.A.3 above." *Id.* at Part VI.A.

In turn, the approved erosion and sediment control and stormwater management plans for the Site expressly refer to the Response Action Plan.   For example, the "Initial Conditions Sediment Controls Plan," under the "Maryland Department of the Environment Response Action Plan(s) (RAP) General Construction Notes" section, states that "the contractor shall follow all guidelines set forth in the RAP and its amendments for all construction related activities on the Site." Def. CBAC's Mem. Supp. Mot. Dismiss Ex. 6 C-30-1; *see also, e.g., id.* at C 50-06 ("Construction specifications shall be subject to the provisions in the Final RAP Report and the Final Geotechnical Report.").  As such, the

erosion and sediment control and stormwater management plans for the Site expressly incorporate the remedial measures identified in the Response Action Plan and expressly state that compliance with and performance of these measures is a requirement of the sediment control and stormwater management plans.[32]

Thus, in summary, the general NPDES permit, under which the Site is now included, requires compliance with the sediment control and stormwater management plans and, in turn, those plans require compliance with the "voluntary" Response Action Plan.   In assessing whether the Response Action Plan imposes any legal obligations upon the CBAC Defendants in light of this regulatory chain, it is worth noting that the Response Action Plan and the sediment control and stormwater management plans were approved by different regulatory entities.   The Maryland Department of the Environment oversees Response Action Plans under the Maryland Voluntary Cleanup Program, while the City oversees the sediment control and stormwater management plans.   Thus, it was the City's decision to include compliance with the MDE-formulated Response Action Plan into the sediment and stormwater management plans that bootstrapped the otherwise voluntary Response Action Plan into the NPDES permit.   In light of the interwoven nature of the regulatory requirements as created by the plain language of the governing documents, this Court must conclude that the NPDES permit incorporates the Response Action Plan with respect to the Site and that the CBAC Defendants' compliance with the Response Action Plan is no longer voluntary.

---

[32] As detailed above, the Response Action Plan identifies several specific remediation activities, including a cap at the Site and vapor mitigation system.  *See supra* note 15; *see also* Def. CBAC's Mem. Supp. Mot. Dismiss Ex. 13 (MDE Approval Letter & FINAL Response Action Plan).

In an attempt to trigger the "no inconsistency" exception of the anti-duplication

provision, Plaintiffs emphasize that NPDES permits typically regulate discharges from point

sources rather than point sources themselves.   In support of their position, Plaintiffs also

highlight RCRA's definition of "solid waste" in an attempt to limit the effect of the anti-

duplication provision in this case.   In particular, Plaintiffs cite 40 C.F.R. § 261.4 and

accompanying comment, which states:

> (a) Materials which are not solid wastes. The following materials
> are not solid wastes for the purpose of this part:
>
>     *      *      *
>
> (2) Industrial wastewater discharges that are point source
> discharges subject to regulation under section 402 of the Clean
> Water Act, as amended.
>
> [Comment: This exclusion applies only to the actual point
> source discharge. It does not exclude industrial wastewaters
> while they are being collected, stored or treated before
> discharge, nor does it exclude sludges that are generated by
> industrial wastewater treatment.]

Pls.' Mem. Supp. Mot. Leave File Sur-Reply 12-13 (citing 40 C.F.R. § 261.4).[33]

While the cited regulations are indeed relevant in determining whether the materials

washing off the Site are "solid waste" for purposes of RCRA, they are not fully

determinative of this Court's analysis of the applicability of RCRA's anti-duplication

provision.[34]   Notably, the anti-duplication provision provides that RCRA does not apply to

---

[33] Plaintiffs also cite COMAR 25.13.02.04A, which states that "[i]ndustrial wastewater discharges that are point source discharges permitted pursuant to §402 of the Clean Water Act, as amended, or permitted pursuant to Environment Article, §§9-324-9-332, Annotated Code of Maryland" are "materials that are not solid wastes for purposes of this chapter."

[34] Indeed, this Court's conclusion—despite Plaintiffs' contentions—is consistent with the purpose of the regulations.  As Plaintiffs point out, the "purpose of the industrial wastewater discharge exclusion 'is to avoid

"any *activity or substance* which is subject to" the Clean Water Act unless there is no inconsistency created by regulation under both Acts. 42 U.S.C. § 6905(a).

In this case, of course, any stormwater discharge from the Site is clearly covered by the Maryland General Construction Stormwater Permit. The somewhat closer question is whether the CBAC Defendants' construction activities themselves are regulated under the Clean Water Act and could be further regulated under RCRA without the creation of a regulatory inconsistency.[35] This Court has already determined that the CBAC Defendants must comply with certain construction and remediation requirements due to the incorporation of the Response Action Plan into the sediment control and stormwater management plans and, thereby, the NPDES permit. As such, further remedial requirements imposed under RCRA would be inconsistent with the remedial activities already deemed appropriate for the Site as part of the obligations imposed by the Maryland Department of the Environment in connection to sediment control and stormwater management regulations.[36]

---

duplicative regulation, not to create a regulatory hole through which billions of gallons of hazardous wastes can be pumped into the earth without any controls.'" Pls.' Mem. Supp. Mot. Leave File Sur-Reply 7, ECF No. 33-1 (quoting *Inland Steel Co. v. U.S. EPA*, 901 F.2d 1419, 1423 (7th Cir. 1990)). Of course, in this case, the Plaintiffs' activities—the excavation and grading activities that Plaintiffs allege amount to disposal—are not conducted "without any controls." The Site is subject to a detailed sediment control and stormwater management plan, which incorporates a similarly complex Response Action Plan.

[35] Plaintiffs cite a number of cases to support their contention that the industrial discharge exception should be narrowly construed. *See See* Pls.' Mem. Supp. Mot. Leave File Sur-Reply 14-15 (citing *State v. PVC Chemicals, Inc.*, 50 F.Supp.2d 171, 179 (W.D.N.Y. 1998); *Waterkeeper Alliance v. U.S. Dept. of Defense*, 152 F.Supp.2d 163, 169-70 (D.P.R. 2001); *Humboldt Baykeeper v. Union Pacific R. Co.*, No. C-06-02560, 2006 WL 3411877, *6 (N.D.Ca. Nov. 27, 2006); *Westfarm Ass. P'ship v. International Fabricare Institute*, 846 F.Supp. 422, 435 (D.Md. 1993). Notably, none of those cases specifically address industrial discharges pertaining to construction sites; all involve different types of industrial discharges.

[36] Plaintiffs cite to several cases to suggest that remedial activities related to voluntary remediation or consent decrees do not bar a suit under RCRA. *See* Pls.' Mem. Supp. Mot. Leave File Sur-Reply 10-11 (citing *Marcas, LLC v. Bd. of Cty. Commissioners of St. Mary's Cty.*, No. WGC-07-196, 2013 WL 3875376, (D. Md. July 25,

Moreover, a ruling in Plaintiffs' favor would require this Court to simply ignore express provisions in the Maryland General Construction Stormwater Permit and the sediment control and stormwater management plans.  Plaintiffs have not directly challenged the inclusion of the specific provisions regarding movement or removal of contaminated soils as part of a NPDES permit,[37] but a ruling in Plaintiffs' favor would effectively strike those provisions from the Permit.  In light of the fact that the validity of the Permit provisions is not an issue squarely before this Court, it would be improper for this Court to dismantle the regulatory framework approved by the Maryland Department of the Environment and the City of Baltimore at this juncture.[38]  Accordingly, the CBAC Defendants' Motion to Dismiss is GRANTED.

## B.  Failure to State a Claim Under Rule 12(b)(6) and *Iqbal/Twombly*

Having dismissed the CBAC Defendants, this Court will now address the adequacy of Plaintiffs' substantive claims as to the remaining Defendants Maryland Chemical and the City.

---

2013); *Spillane v. Commonwealth Edison Co.*, 291 F. Supp. 2d 728, 736-37 (N.D. Ill. 2003); *Interfaith Community Organization v. Honeywell International, Inc.*, 399 F.3d 248, 264-267 (3rd Cir. 2005); *Raritan Baykeeper, Inc. v. N.L. Industries, Inc.*, No. 09-CV-4117, 2013 WL 103880, *10 (D.N.J. Jan. 8, 2013); *Community Ass'n for Restoration of the Environment, Inc.*, No. 13-cv-3017-TOR, 2013 WL 218821, *6-7 (E.D. Wash. June 21, 2013)).  The case presently before the Court is distinguishable, however, due to the existence of a NPDES permit incorporating the Response Action Plan.

[37] In particular, Plaintiffs have not argued that (1) the incorporation of the sediment control and stormwater management plans into a NPDES permit exceeds the permissible scope of such permits; or (2) that the inclusion of such plan requirements was authorized by state law and, therefore, is a requirement that does not trigger the basic prohibition of the anti-duplication provision.

[38] Maryland law provides specific procedures to be followed with respect to challenges to discharge permits. *See* COMAR 26.08.04-01-3; *see also* Md. Code, State Govt. § 10-201 *et seq.* (Administrative Procedure Act—Contested Cases); Md. Code, Envir. § 1-601 *et seq.* (Public Participation in the Permitting Process).

1. <u>Count I – 42 U.S.C. § 6972(a)(1)(A)</u>

Plaintiffs first count asserts a claim against the City and the CBAC Defendants under 42 U.S.C. § 6972(a)(1)(A).[39]  Section 6972(a)(1)(A) provides that "any person may commence a civil action on his own behalf . . . against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter."   42 U.S.C. § 6972(a)(1)(A).   Liability under § 6972(a)(1)(A) requires a continuing violation.  *See Potomac Riverkeeper, Inc. v. National Capital Skeet & Trap, Inc.*, 388 F. Supp. 2d 582, 587 (D. Md. 2005).

The Complaint identifies a number of regulations that the Defendants have allegedly violated.[40]  Nevertheless, the City contends that Plaintiffs have failed to plead sufficient facts

---

[39] As noted above, the CBAC Defendants have already been dismissed from this action.

[40] Specifically, the Plaintiffs' Complaint alleges the following specific violations:

118. By virtue of the construction activities described in paragraphs 90-100 above, Baltimore City and CBAC Gaming generated "solid waste" and/or "hazardous waste," as those terms are defined in 40 C.F.R. § 261.2; Md. Code Ann., Envir., §7-201; COMAR 26.13.01.03B, COMAR 26.13.02.02 and COMAR 26.13.02.03.

119. After generating solid waste and/or hazardous waste during the construction activities described in paragraphs 90 through 100 above, Baltimore City and CBAC Gaming failed to determine whether the waste was hazardous, in violation of 40 CFR § 262.11 and COMAR 26.13.03.02.

120. By virtue of the construction activities described in paragraphs 90 through 100 above (including, but not limited to, mixing, moving, stockpiling, grading and/or backfilling contaminated soils and/or groundwater), Baltimore City and CBAC Gaming "treated", "stored" and/or "disposed" of hazardous waste at the Casino Site, as those terms are defined in 40 C.F.R. § 260.10 and COMAR 26.13.01.03B.

121. The Casino Site is not, and has never been, a permitted hazardous waste treatment, storage or disposal facility.

to state a plausible claim under § 6972(a)(1)(A).   Specifically, the City argues that the Plaintiffs have failed to identify the hazardous waste that the City has allegedly "treated, stored and/or disposed in violation of RCRA."  Def. City's Mem. Supp. Mot. Dismiss 25.

The Complaint states that various environmental assessments identified "'hot spots' (i.e., highly concentrated concentrations of contaminants at various depths and various locations) in the surface and subsurface soils throughout the Russell Street Properties which would render the soils to be considered 'hazardous waste,' as defined under applicable federal and state hazardous waste laws, once excavated."[41]  Pls.' Compl. ¶ 77.  The Plaintiffs

---

122. Baltimore City and CBAC Gaming treated, stored, disposed of, and/or transported hazardous wastes during the construction activities described in paragraphs 90 through 100 above, without complying with the applicable generator standards, *in violation of 40 C.F.R. §§ 262.20 through 260.44; COMAR 26.13.03.01 through 26.13.03.06, and Md. Code Ann., Envir., § 7-224.*

123. Baltimore City, CBAC Gaming and CBAC Borrower have not and have never obtained a permit to own and/or operate a hazardous waste treatment, storage or disposal facility at the Casino Site as required by *Md. Code Ann., Envir., § 7-232 and COMAR 26.13.07.01A.*

124. By virtue of the construction activities described in paragraphs 90 through 100 above, Baltimore City, CBAC Borrower and CBAC Gaming owned/or operated an unpermitted hazardous waste treatment, storage or disposal facility without complying with the applicable facility standards and permit requirements, in violation of *Md. Code Ann., Envir., §§ 7-224, 7-232; COMAR 26.13.05.01 through 26.13.05.05 and COMAR 26.13.07.01.*

Pls.' Compl. ¶¶ 117-124 (emphasis added).

Notably, the parties agree that Maryland's regulatory requirements are the applicable standards in this case due to the fact that EPA has approved a state-run hazardous waste program pursuant to 42 U.S.C. § 6926.  *See* Def. CBAC's Reply 4 & n.4, ECF No. 30; Pls.' Resp. 32 n. 9, ECF No. 24.

[41] As indicated above, the Complaint specifically identifies a number of contaminants and/or chemical substances found in the soil, groundwater, and soil vapors at the Site.  *See supra* notes 10-13 & accompanying text; *see also* Pls.' Compl. ¶¶ 75-80.  These substances include tetrachloroethylene ("PCE"), trichloroethylene ("TCE"), 2,4,6-Trichloroanisole ("TCA"), chloroform, vinyl chloride, cis-1,2-dichloroethene, trans-1,2-dichloroethene, hexane, pentane, acenapthene, anthracene, benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, flouranthene, fluorene, phenanthrene, pyrene, antimony, aluminum, arsenic, cadmium, chromium, lead, manganese, nickel, thallium, mercury, silver, and vanadium.

assert that the City thereafter undertook activities at the Site that amounted to violations of

RCRA, including:

> 91.   On or around May 2008 through December 31, 2009 and during Baltimore City and BDC's ownership and/or operation of the Casino Site, Baltimore City and BDC allowed illegally stored and/or abandoned drums containing hazardous wastes to leak, spill and/or otherwise release into the Casino Site.

> 92.  On or before March 2009 through December 31, 2009, and during Baltimore City and BDC's ownership and operation of the Casino Site, Baltimore City and BDC excavated, moved, mixed, stockpiled, backfilled and/or graded contaminated soils and groundwater at the Casino Site in order to, among other things, address abandoned pits used during previous industrial operations which contained contaminated groundwater and/or rainwater and remove at least one (1) UST located at the Russell Street Properties.

> 93.  Baltimore City and BDC's construction activities included excavating, moving, mixing, backfilling and/or grading contaminated soils and/or groundwater located in and around known hot spots of PCE, TCE and heavy metals.

*Id.* ¶¶ 91-93.  In the Plaintiffs' view, these activities constitute the generation of "'solid waste'

and/or 'hazardous waste,' as those terms are defined in 40 C.F.R. § 261.2; Md. Code Ann.,

Envir., § 7-201; COMAR 26.13.01.03B, COMAR 26.13.02.02 and COMAR 26.13.02.03."[42]

*Id.* ¶ 118.

---

[42] The Code of Maryland Regulations defines "hazardous waste" as "a hazardous waste as defined in COMAR 26.12.02" and is "synonymous with Controlled Hazardous Substance or CHS, except as provided in COMAR 26.13.02.06."  COMAR 26.13.01.03B(31).    Solid waste is defined as "a solid waste as defined in COMAR 26.13.02."  COMAR 26.13.01.03B(73).

Section 26.13.02.03 states that "[a] solid waste, as defined in [COMAR 26.13.02.02], is a hazardous waste if (1) it is not excluded from regulation as a hazardous waste under [COMAR 26.13.03.04-1]; and (2) . . . (b) it is listed in [COMAR 26.13.02.15-19] and has not been excluded from the lists by COMAR 26.13.01.04A and C.

Of course, these specific allegations must be viewed in light of the over-arching claims in this case. Notably, Plaintiffs allege that the City's construction activities were conducted "in order to, among other things, address abandoned pits used during previous industrial operations which contained contaminated groundwater and/or rainwater and remove at least one (1) UST located at the Russell Street Properties." *Id.* ¶ 92. Plaintiffs provide no factual allegations to explain how the removal of contaminated soil and/or sources of potential contaminants actually exacerbated or contributed to contamination at the Site. Similarly, Plaintiffs have provided no factual details pertaining to the alleged storage and/or abandonment of leaky drums, nor have they identified the specific contaminants associated with that alleged "disposal." Finally, Plaintiffs have not made any plausible factual allegations indicating that the migration of contaminants at the Site occurred during the City's ownership of the Site.[43] In light of these deficiencies, Plaintiffs have failed to state a plausible claim and Count I will be dismissed.[44]

---

[43] In fact, Plaintiffs allege significant off-site contamination before the period of the City's ownership. *See* Pls.' Compl. ¶¶ 52-56, 59-63, 75-79.

[44] The City also contends that the Plaintiffs have failed to allege any continuing violation on its part. The City characterizes the alleged harm as "past action" and asserts that "Plaintiffs' allegations of 'ongoing' violations by the City are undercut by the reality that there is an MDE-approved Response Action Plan in progress to remediate contamination at the Casino Site and that MDE is monitoring the implementation of the plan and, if necessary, will take action at the Casino Site to safeguard the public health and environment." Def. City's Mem. Supp. Mot. Dismiss 24. The Plaintiffs, however, argue that "passive and/or ongoing migration of previously dumped waste by a current owner/operator may . . . be sufficient to establish an 'ongoing violation' claim under § 6972(a)(1)(A)." Pls.' Resp. 30-31. The Plaintiffs further contend that the contamination at the Russell Street Properties—which are owned by the City—has "never been remedied" and is therefore "ongoing." *Id.* at 35. Additionally, Plaintiffs argue that "the City is **currently** in violation of federal and state TSD facility permitting requirements and facility standards." *Id.*

　　Both sides point to *Potomac Riverkeeper, Inc. v. National Capital Skeet & Trap Club, Inc.* in support of their arguments. In that case, the plaintiff asserted a claim under § 6972(a)(1)(A), alleging that the wash out of spent lead shot constituted a violation of EPA regulations prohibiting disposal of solid waste in a flood plain. The defendant club argued that the Plaintiff had failed to state a claim because the Plaintiff had not alleged that "additional lead shot [had] been introduced into the environment" by the club or its members for some time. Judge Quarles of this Court rejected this argument, noting that "[t]he movement of previously

2.  Count II – 42 U.S.C. § 6972(a)(1)(B)

Plaintiffs' second count asserts a claim against all Defendants pursuant to 42 U.S.C. § 6972(a)(1)(B), which creates liability for entities that contribute to the contamination of sites with hazardous waste that poses a special danger to the public or environment.[45] Specifically, the statute, in relevant part, provides that:

> [A]ny person may commence a civil action on his own behalf . . . against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).  Thus, a proper defendant to a § 6972(a)(1)(B) claim must have contributed to the situation giving rise to the health or environmental hazard.  While

---

disposed solid waste may constitute a violation of RCRA." *Nat'l Capital Skeet & Trap*, 388 F. Supp. 2d. 582, 587 (D. Md. 2005).  Judge Quarles noted:

> Whether ongoing conduct is required for an ongoing violation of the RCRA "turns on the wording of the prohibition alleged". *South Road Assocs. v. IBM*, 216 F.3d 251, 255 (2nd Cir. 2000). . . . The open dumping of solid waste within a flood plain involves "the washout of solid waste which poses a hazard to human life, wildlife, or land or water resources." 40 C.F.R. § 257.3–1. The "washout" of solid waste is defined as the "carrying away of solid waste by waters[.]" 40 C.F.R. § 257.3–1(b)(3). "Carrying away" does not require ongoing human conduct.

*Id.* Having noted conflicting evidence on the issue whether the continuous washouts posed a threat to wildlife, land, and water resources, Judge Quarles ultimately denied summary judgment. *Id.* at 587-88.

In their papers, Plaintiffs rely upon *National Capital Skeet & Trap* as support for the legal principle that passive migration qualifies as an ongoing violation.  The City, however, asserts that the case actually supports its own position; in the City's view, the cases are distinguishable because the defendant club in *National Capital Skeet & Trap* had dumped the waste in question, whereas the City has not dumped or added any waste to the Site.  Def. City Reply 9-10, ECF No. 32.  In light of Plaintiffs' failure to plausibly allege any disposal on the part of the City, this Court need not resolve the applicability of *National Capital Skeet & Trap* in this case.

[45] As noted above, the CBAC Defendants have already been dismissed from this action.

"contribution" under § 6972(a)(1)(B) is generally broadly construed, the case law interpreting the term requires some degree of active human conduct. *See SPS Limited Partnership, LLLP v. Severstal Sparrows Point, LLC*, 808 F. Supp. 2d 794, 806-07 (D. Md. 2011) (summarizing cases and concluding that migration of contaminants from coke ovens was insufficient to state a § 6972(a)(1)(B) claim).

The "imminent and substantial endangerment" requirement is the other key component of a § 6972(a)(1)(B) claim. "An endangerment is a 'reasonable cause for concern that someone or something may be exposed to a risk of harm ... if remedial action is not taken.' *Adams v. NVR Homes, Inc.*, 135 F. Supp. 2d 675, 688 (D. Md. 2001) (quoting *Foster v. U.S.*, 922 F.Supp. 642, 661 (D.D.C. 1996)), *reconsideration granted on other grounds* 142 F. Supp. 2d 649 (D. Md. 2001). As explained in *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485-86 (1996), "an endangerment can only be imminent if it threatens to occur immediately, . . . and the reference to waste which may present imminent harm quite clearly excludes waste that no longer presents such a danger." *Id.* at 485–86 (internal citations and quotations omitted). Moreover, an endangerment is "substantial" if it is "'serious' and 'there [is] some necessity for action.'" *Adams*, 135 F. Supp. 2d at 688 (quoting *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)).

All Defendants argue that the Plaintiffs have not adequately pled a claim under § 6972(a)(1)(B) because Plaintiffs have not pled any facts demonstrating affirmative action that would constitute "contribution." Def. CBAC's Mem. Supp. Mot. Dismiss 20; Def. City's Mem. Supp. Mot Dismiss 28; Def. MD Chem's Mem. Supp. Mot. Dismiss 14. The Complaint alleges various actions by each of the Defendants. Plaintiffs allege "contribution"

on the part of Maryland Chemical due to "spilling, releasing, and/or disposing of hazardous wastes" at the Site. *See* Pls.' Compl. ¶¶ 51, 134. Plaintiffs provide no further factual details concerning the events that precipitated these alleged releases.[46] In light of the fact that "hazardous waste may leak or spill without any active human participation," *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992), the Complaint contains inadequate factual allegations to determine whether the alleged releases during Maryland Chemical's ownership/operation of the Site constitute sufficient affirmative action so as to give rise to liability under § 6972(a)(1)(B). *See Delaney v. Town of Carmel*, 55 F. Supp. 2d 237, 256 (S.D.N.Y. 1999) ("The term ['contributed to'] has been universally held to infer something more than mere ownership of a site; some level of causation between the contamination and the party to be held liable must be established."). Accordingly, Maryland Chemical will be dismissed from this action.[47]

---

[46] Paragraph 51 of the Complaint contains the most detailed account of these alleged releases. While that paragraph identifies the contaminants allegedly released and the location of origin, the only other factual detail is that one of the releases occurred from an underground storage tank. *See* Pls.' Compl. ¶ 51 ("Maryland Chemical's past operations at the Russell Street Properties resulted in spills and releases of hazardous substances and/or hazardous wastes including, but not limited to: at least one (1) TCE spill of an unidentified quantity in the northern portion of 1551 Russell Street (at or around the former Maryland Chemical storage yard); at least two (2) PCE spills of unidentified quantities in the northern portions of 1551 and 1525 Russell Street (at or around the former Maryland Chemical loading area, paint storage area and hazardous waste storage area); and at least one (1) release of petroleum compounds containing diesel range organics ("DROs") and polycyclic aromatic hydrocarbons ("PAHs") (including, but not limited to, acenaphthene, anthracene, benzo(a)pyrene, cyrsene, dibenzo(a,h)anthracene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, fluroanthene, fluorene, phenanthene and pyrene) from an underground storage tank ("UST") containing diesel fuel oil located at the southern portion of 1501 Russell Street.")

[47] Maryland Chemical asserts several other arguments in support of its Motion to Dismiss. For example, it argues that its activities at the Site "are too remote in time and location" and that the Site has been "admittedly disturbed and altered by intervening use and development"; accordingly, Maryland Chemical asserts that its activities cannot be traced to any threat to the Waterfront Parcels and do not rise to the level of an imminent and substantial endangerment. Def. MD Chem.'s Mem. Supp. Mot. Dismiss 8-10. Maryland Chemical further argues that it is not a proper defendant in this case because there is no "action to order Defendants to take" "that would improve the situation" in light of the current remediation activities and Maryland Chemical's lack of an ownership stake in the Site. Def. MD Chem.'s Mem. Supp. Mot. Dismiss 11-

With respect to the City, Plaintiffs allege contribution by means of the "excavating, moving, mixing, backfilling and/or grading contaminated soils and/or groundwater" performed at the Casino Site. Pls.' Compl. ¶ 137. Essentially, Plaintiffs contend that the City contributed to the contamination hazard by redistributing the contaminated soils and/or groundwater around the Site by means of their earth-moving activities. Several courts have held that similar types of activities constitute "active" conduct that may give rise to liability under § 6972(a)(1)(B). *See, e.g., Raritan Baykeeper, Inc. v. NL Industries, Inc.*, Civ. A. No. 09-cv-4117 (JAP), 2013 WL 103880, at *13 (D.N.J. Jan. 8, 2013) (holding that defendants' activities at site, including on-site remediation, excavation, and capping, constituted active conduct). Nevertheless, as explained in Part IV.B.1, Plaintiffs have failed to state any plausible factual allegations with respect to disposal of hazardous waste (as opposed to removal of contaminated soil and other remedial activities) at the Site. Accordingly, Plaintiffs have failed to state a claim under § 6972(a)(1)(B) as to the City as well.

<u>CONCLUSION</u>

For the reasons stated above, Plaintiffs' Motion for Leave to File Sur-Reply (ECF No. 33) is GRANTED. In addition, Defendants CBAC Gaming, LLC and CBAC Borrower, LLC's Motion to Dismiss (ECF No. 11), Defendant Maryland Chemical Company, Inc.'s Motion to Dismiss (ECF No. 13), and Defendants Mayor and City Council of Baltimore and Baltimore Development Corporation's Motion to Dismiss (ECF No. 15) are GRANTED.

---

12. In light of Maryland Chemical's dismissal from this action, there is no need for this Court to address these arguments.

A separate Order follows.

Dated:          July 16, 2014                              _____/s/_____
                                                          Richard D. Bennett
                                                          United States District Judge